**In the Interest of G.R.W., a Child.**

No. 06–05–00081–CV.

Court of Appeals of Texas, Texarkana.

Submitted March 20, 2006.

Decided May 2, 2006.

Timothy Haney, Attorney At Law, Sherman, for appellant.

Edwin Marino, Legal Aid, McKinney, Charles W. Butler, Attorney At Law, Bonham, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

When James Elwyn Sykes was fifteen or sixteen years old, he had a sexual relationship with S.W., who was then at least three years younger than he. Sykes was indicted for sexual assault of S.W., but, pursuant to a plea agreement, pled guilty to the lesser charge of child endangerment. Sykes' and S.W.'s relationship produced a child, G.R.W., born November 4, 2003. The conservatorship of G.R.W. is the subject of this appeal.

Sykes and his mother, Donna Alexander—in whose home Sykes and S.W. had lived and shared sleeping quarters during much of the time they maintained their sexual relationship—sought to be named sole managing conservators for G.R.W. Ronald Glen Harris and wife, Rita Faye Harris (the Harrises), G.R.W.'s maternal great-uncle and great-aunt, were granted sole managing conservatorship by the trial court, while Sykes and Alexander were appointed possessory conservators.

■ Sykes and Alexander contend the trial court abused its discretion in naming the Harrises sole managing conservators because the trial court failed to honor the presumption of Section 153.131 of the Texas Family Code that it is in a child's best interest that custody be awarded to the child's parent. Sykes and Alexander assert the trial court's order must be reversed because there is insufficient evidence to rebut the presumption favoring the natural parent, Sykes, as possessory conservator, and because there was no finding that appointing Sykes as sole managing conservator would be detrimental to G.R.W.'s physical health or emotional development. In support of their assertion, Sykes and Alexander cite Section 153.131(a) of the Texas Family Code, which requires a parent to be appointed sole managing conservator or both parents to be appointed joint managing conservators unless the trial court determines such appointment would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code Ann. § 153.131(a) (Vernon 2002).[1]

Sykes and Alexander also note that, after trial, they asked the trial court to make findings of fact and conclusions of law under Rule 296 of the Texas Rules of Civil Procedure and that the trial court did not issue any findings or conclusions in response to their request. They argue that we must, therefore, presume the trial court made no finding—neither (1) a finding under Section 153.131(a) that appointing Sykes as sole managing conservator "would significantly impair [G.R.W.]'s physical health or emotional development," nor (2) a finding under Section 153.131(b)

1. But in a habeas corpus action to obtain immediate possession of a child, the party who proves immediate possession under some prior order is entitled to possession unless the trial court makes a written finding in temporary orders that there is a "serious immediate question" concerning the child's welfare, notwithstanding that the governing statute, Section 14.10(c) of the Texas Family Code, does not expressly require a *written* finding. *See*

*Whatley v. Bacon,* 649 S.W.2d 297, 299 (Tex. 1983); *McElreath v. Stewart,* 545 S.W.2d 955, 958 (Tex.1977); *In re Whatley,* No. 06-06-00035-CV, 2006 WL 870325, at *2, 2006 Tex. App. LEXIS 2686, at *8 (Tex.App.-Texarkana Apr. 6, 2006, orig. proceeding) (mem.op.); *In re Lau,* 89 S.W.3d 757, 759 (Tex.App.-Houston [1st Dist.] 2002, orig. proceeding); *M.R.J. v. Vick,* 753 S.W.2d 526, 528 (Tex.App.-Fort Worth 1988, orig. proceeding).

that there was a history of family violence, as set out in Section 153.004—necessary to rebut the parental presumption favoring Sykes. We disagree.

First, though Section 153.131(a) requires a trial court finding to rebut the parental presumption, such a finding need not be explicitly made. "In drafting the Family Code (and other statutes as well), the Legislature often requires judges to 'find' certain matters before taking certain actions, but only occasionally requires those findings to be made in writing." *In re J.P.*, 136 S.W.3d 629, 630–31 (Tex.2004) (footnotes omitted). Because Section 153.131(a) makes no requirement of a written finding, such a finding need not be in writing. *See* Tex. Fam.Code Ann. § 153.131(a).

Second, a party who asks a trial court, under Rule 296 of the Texas Rules of Civil Procedure, to enter findings of fact and conclusions of law, but fails to give the trial court the subsequent Rule 297 notice that the requested findings and conclusions are late, has waived his or her right to complain about the trial court's failure to enter findings and conclusions. *Las Vegas Pecan & Cattle Co. v. Zavala County*, 682 S.W.2d 254, 255–56 (Tex.1984); *Gaxiola v. Garcia*, 169 S.W.3d 426, 429–30 (Tex.App.-El Paso 2005, no pet.); *In re A.I.G.*, 135 S.W.3d 687, 694 (Tex.App.-San Antonio 2003, no pet.). While Sykes and Alexander requested findings of fact and conclusions of law, the record contains no Rule 297 notice. They have, therefore, waived their right to complain about the lack of formal findings.

Because of that, the trial court's failure here to make explicit findings rebutting Sykes' natural-parent presumption is of no consequence. If the record contains factually and legally sufficient evidence to support the necessary findings, we must affirm the trial court's judgment.

■■■ There is legally insufficient evidence only if: (1) there is a complete absence of evidence of a vital fact; (2) the court may not give weight to the only evidence offered to prove a vital fact; (3) the evidence amounts to no more than a mere scintilla;[2] or (4) the evidence conclusively negates a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998). In reviewing for legally sufficient evidence, we are to consider evidence favorable to the finding if a reasonable fact-finder could do so, and are to disregard evidence contrary to the finding unless a reasonable fact-finder could not disregard it. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

■■■ The evidence is factually insufficient if the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). In assessing factual sufficiency, we are to consider all of the record evidence, not just the evidence supporting the judgment. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998).

**2.** When the evidence on a vital fact is so weak that it does no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex.2002). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996).

Where evidence shows merely that a parent has been victimized, that is no evidence to rebut the presumption as to that parent. *Lewelling v. Lewelling,* 796 S.W.2d 164, 167 (Tex.1990) (evidence that parent suffered physical abuse at hands of spouse is "no evidence" to rebut parental presumption). The presumption, however, can certainly be rebutted by evidence of blameworthy prior behavior of the parent. *See, e.g., In re K.R.P.,* 80 S.W.3d 669, 677 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (affirming nonparent as managing conservator, where parent had prior convictions, history of family violence, and smoking in asthmatic child's presence). Such evidence can include "immoral behavior" of the parent. *Chavez v. Chavez,* 148 S.W.3d 449, 458–59 (Tex.App.-El Paso 2004, no pet.). In fact, even without evidence establishing any blameworthiness of the parent, the parental presumption can be rebutted by other evidence establishing the statutorily required negative effect on the child. *Id.* ("Because safety, security, and stability are critical to child development, the danger of uprooting a child may in some instances rise to a level that significantly impairs the child's emotional development."); *In re Rodriguez,* 940 S.W.2d 265, 270–75 (Tex.App.-San Antonio 1997, writ denied) (parental presumption rebutted solely by "devastating" effect on child of being removed from only home she had ever known).

Though there is conflicting evidence on point, there is legally sufficient evidence to support the necessary findings, and the contrary evidence was not so great as to render the supporting evidence factually insufficient. We review the evidence.

■ Ronald Hamilton, with Child Protective Services (CPS), testified that, from the time G.R.W. was approximately a month old, CPS was involved and S.W. agreed to take G.R.W. to the Harrises' home so Mrs. Harris could help care for him and teach S.W. how to care for him. Even before receiving placement of G.R.W. in their home when he was three months old, the Harrises had considerable previous contact with G.R.W. and figured prominently in G.R.W.'s care. The Harrises' home is "immaculate, clean"; and Mrs. Harris is "completely capable of caring for" G.R.W. and "very willing" to do so. A visit to the Harrises' home just before trial revealed that G.R.W. was "doing fine," "walking now," on Medicaid, getting the services he can get, and living in a "very appropriate" home. Hamilton never met Sykes or Alexander.

Duann Bragg, who did the social study in this case, testified that, by the time of trial, the then eighteen-month-old G.R.W. had lived with the Harrises since he had been about three months old. According to Bragg, G.R.W. has bonded with the Harrises and has identified them as his care-givers and parent figures. Bragg testified that it would be "horribly detrimental" to G.R.W. and would do him some "pretty tremendous damage" if he were to be removed from the Harrises' home. But, on cross-examination, Bragg stated that it was "impossible to say" how removing G.R.W. from the Harrises' home would affect him emotionally.

According to Bragg, Alexander provided contraceptives to S.W. while she lived in the Alexander/Sykes home. While the twelve- or thirteen-year-old S.W. lived in Alexander's home, Alexander did not send her to school. Now living with Alexander, Sykes, Sykes' father, and Sykes' fiancé, Alisha Weeks, is Weeks' one-year-old child. The Alexander/Sykes home has what it needs and is clean.

Bragg testified that G.R.W. has special physical needs, including severe respiratory problems. Sykes and his father are smokers. On the other hand, Bragg sees

no danger to G.R.W. in being cared for by Sykes and Alexander. When cross-examined by G.R.W.'s attorney ad litem, Bragg stated that Sykes' and his father's smoking would be a danger to G.R.W. She also expressed concern about past decisions made by Alexander and Sykes, raising questions on how well they would train G.R.W. to be a "good adult."

Adam Metz, a service coordinator for Early Childhood Intervention (ECI), testified that, by the time of trial, he had been working with G.R.W. for four to five months. G.R.W. was in the ECI program due to "atypical development," primarily involving his motor skills limitations. When Metz started working with G.R.W., then thirteen or fourteen months old, G.R.W. was not walking; but he now is walking. G.R.W. needs to be cared for using ECI's family service plan to help him with his motor skills and with communications; he has challenges with both. The Harrises have been working with G.R.W. and have been instructed by Metz during his weekly visits to the home. For G.R.W., it is most important for him to continue in the ECI service plan. As G.R.W. grows older, it will become more important for him to have interaction with other children his age. He is the only child in the Harris home.

Rita Harris testified that she does not drink or smoke and has never been arrested. When S.W. lived with her father, Mr. Harris would go over to that house and try to awaken S.W. in order for her to go to school. She would often not go, giving one excuse or another, and saying that her father gave her permission to stay home. So that S.W. would be able to "run around" on weekends, she would bring G.R.W. to the Harrises to care for, beginning when G.R.W. was five or six weeks old. G.R.W. was born six weeks premature. G.R.W. had problems breathing because of the smoking environment. S.W. was not a dependable mother, and Mrs. Harris' efforts to teach her parenting skills never "took." S.W. voluntarily placed G.R.W. in the Harrises' home initially as a result of G.R.W.'s being burned on his arm and CPS suggesting the placement. The Harrises have obtained medical care for G.R.W., and they give him his respiratory medication when he needs it. Every week when G.R.W. returns from being at the Alexander/Sykes home, he has symptoms indicating he has been around cigarette smoke: coughing, runny nose, and wheezing. After about a week at the Harrises' home, G.R.W. is back to normal; but then it is time for him to return to the Alexander/Sykes home. And the situation repeats. In fact, G.R.W. has not been really well since he has been visiting the Alexander/Sykes home.

Mrs. Harris had health problems, but, taking two medications, she is "fine" now and can care for G.R.W. G.R.W. calls her "Mamma" and calls Mr. Harris "Dad." Though the Harrises have no children at home, there are children in the Harrises' extended family for G.R.W. to play with when he is in the Harrises' care. The Harrises are disabled and draw about $2,000.00 to $2,400.00 per month. Their house is paid for. Mrs. Harris expresses love for G.R.W. and aspires for him to go to college and have a bright future. Mrs. Harris was a school secretary and a substitute teacher for the Melissa Independent School District for ten years. According to Mrs. Harris, G.R.W. "makes my day."

Mrs. Harris is legally blind in her right eye. She is also diabetic and has had gastric bypass surgery, which has helped her control her diabetes. Mr. Harris' disability is heart related. Mrs. Harris called the police to try to stop the relationship between Sykes and S.W. before S.W. became pregnant, but to no avail. Mrs. Harris objects to Sykes' having custody of

G.R.W. because of the smoking and because she feels G.R.W. needs a moral upbringing, something she believes he would not get from Sykes.

Mr. Harris testified that the Harrises have money in the bank and are not financially stressed. Mr. Harris takes a number of medications, but says he is doing "alright." He expresses love for G.R.W. "just like he was my own." Though he has never seen Sykes or Sykes' father smoke around G.R.W., Mr. Harris says that usually when G.R.W. returns from the Alexander/Sykes home, he smells like smoke.

Alexander testified that, when S.W. moved into Alexander's home, Alexander believed that S.W. was a month short of her sixteenth birthday, but later learned she was thirteen years old. S.W. was not going to school at the time. Alexander did not know at first that Sykes and S.W. were having sex, but learned of that fact four or five months before S.W. moved out. Sykes and S.W. got engaged about the time Alexander learned they were having sex. Thinking S.W. was sixteen, and Sykes then being seventeen, Alexander knew that was young for S.W., but thought Sykes and S.W. "could make a go of it. So they got engaged and started planning a wedding." Alexander justified letting S.W. move into her home with Sykes as follows:

> I gave them that chance, because the damage was already done, and I thought that that was more or less trying to take responsibility of the situation. Maybe it wasn't the best decision, but it was the decision I made at the time, because I had very little control of [S.W.].

Alexander does not believe allowing Sykes and S.W. to have sex, even at the age she believed S.W. to be, was right. She also believes it is a sin to have sex outside of marriage, even if there are plans for marriage. According to Alexander, nobody smokes in her house or car. Sykes and his father have an outside area, not connected to the house, where they smoke. "[E]very time" Alexander visited G.R.W. at the Harrises' house, she found G.R.W. in the infant swing, which concerned her. When they bring G.R.W. to the Harrises, G.R.W. cries. Alexander and Sykes have taken food, diapers, and necessities for G.R.W. to the Harrises.

Sykes testified as the final witness. Sykes admitted that, when he was sixteen years old, he had a sexual relationship with S.W., then thirteen. Sykes was indicted for sexual assault of S.W. and pled guilty to the reduced charge of child endangerment in connection with that relationship. Sykes and S.W. had lived together, sharing a bedroom in Sykes' parents' house, for six to eight months, except for two to three months when the young "couple" had lived at S.W.'s father's house. Sykes still lives with his parents, who have never formally married. Sykes dropped out of high school. He still suffers some effects from a head injury he sustained in an automobile accident. He currently lives in his parents' house, with his fiancé, Alisha Weeks, which living arrangement started when Sykes and Weeks were both eighteen years of age.

After our review of all of the evidence, we conclude there is legally and factually sufficient evidence to show that (1) appointing Sykes and Alexander as sole managing conservators would not be in the best interest of G.R.W. because the appointment would significantly impair G.R.W.'s physical health or emotional development, and (2) the trial court's custody ruling was in the best interest of G.R.W. We overrule Sykes and Alexander's sole point of error.

We affirm the judgment.