

NUMBER 13-09-00255-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

DAVID GRAY,                                                              Appellant,

v.

ANN WOOD SHOOK,                                                          Appellee.

### On appeal from the 24th District Court
### of Victoria County, Texas.

# O P I N I O N

### Before Justices Yañez, Benavides, and Vela
### Opinion by Justice Benavides

Appellant, David Gray, appeals the trial court's appointment of appellee, Ann Wood Shook, as sole managing conservator of his daughter, G.W. By one issue, Gray contends that the trial court abused its discretion because (1) Shook did not offer sufficient evidence of harm to overcome the parental presumption; (2) if the parental presumption was overcome, Shook did not establish harm by a preponderance of the evidence; and (3) Shook offered no evidence of any specific acts or omissions by Gray that would

significantly impair the physical health or emotional development of G.W. We reverse and remand.

## I. BACKGROUND

David Gray and Lucy Wood are the biological parents of G.W., who was born on July 9, 2003. On January 30, 2007, Gray filed a suit affecting the parent-child relationship stating, "The best interest of [G.W.] will be served by the appointment of [Lucy] as joint managing conservator [of G.W.] with the exclusive right to designate the primary residence of the child . . . ." Gray also requested that "appropriate orders be made for access to the child and the allocation of the rights and duties of the conservators." On January 23, 2008, Ann Wood Shook, G.W.'s maternal grandmother, filed a petition in intervention stating that she "would show that it is in the best interest of [G.W.] that Intervenor and Respondent [Lucy] be appointed joint managing conservators of [G.W.]." Shook further requested that she "be granted the exclusive right to establish the primary legal residence of the child" and that Gray be appointed possessory conservator of G.W. Gray then amended his petition requesting that he be appointed joint managing conservator with the exclusive right to designate the primary residence of G.W. On June 30, 2008, a bench trial was held at which Shook, Gray, Lucy, and Cheryl Green testified.

Shook stated that G.W. has lived in her home in Victoria, Texas since she was born and that when Lucy moved out of Shook's home approximately two years earlier, G.W. continued living with Shook and her husband. Shook testified that she and her husband have been "raising" G.W. for "about a year-and-a-half." According to Shook, she has filled the role of co-parent with Lucy, and since G.W. was born, Shook and her husband have "taken part in all aspects of raising [G.W.] together" because Lucy "didn't know how much part [Gray] would be in her life." Shook testified that G.W. spends more time with her than

2

with Lucy and that presently, she and her husband are primarily responsible for raising G.W. Shook acknowledged, however, that Lucy was still providing care for G.W. and asked that Lucy be appointed joint managing conservator.

Shook stated that it was in G.W.'s best interest for Gray to be appointed possessory conservator and that it would significantly impair G.W.'s physical health if the trial court appointed Gray managing conservator. Shook testified that she wanted to be appointed managing conservator with the right to determine the residence of the child. According to Shook, if she were not appointed managing conservator, it would significantly impair G.W.'s physical health because

> [i]f [G.W.] were to be taken away from her residence, the only home she's ever known, and moved across the country where she has no family, no support system, I feel—and as an educator and with a degree in counseling, I feel that it would be—and her grandmother, I feel that it would be harmful to her because she has a lot of insecurities now.

On cross-examination, Shook stated that Gray "arrived" after G.W.'s birth and that he did not participate during the pregnancy and did not pay for the medical expenses related to G.W's birth. According to Shook, from the time of G.W.'s birth until the time of trial, Gray had not had contact with G.W. on a monthly basis. Shook stated that Gray has had approximately three to four visits with G.W. per year in the last five years. Shook testified that Gray lived in Houston when G.W. was born; he then moved to New Jersey, then to Denver, Colorado, and then to Seattle, Washington. Shook said that when G.W. was born, Lucy moved into Shook's home and that for a short time, Gray took an "active role" and visited G.W. at least every other weekend; however, the visits soon became "sporadic."

Shook testified that G.W. has started pre-school and that G.W. attends gymnastics, dance class, and play groups with her friends. According to Shook, Lucy usually spends

the night at Shook's house and does not take G.W. away for overnight visits because they do not want to "jerk [G.W.] back and forth." Shook stated that she does not intend to move away from Victoria.

Shook testified that Gray did not acknowledge G.W. as his child while Lucy was pregnant, but after G.W. was born, a paternity test was performed. Shook stated that when Gray was transferred to New Jersey, he did not visit G.W. "real often" and that during that time, G.W. bonded with Shook and Lucy; Shook explained that bonding means "creating a safe place—a place in the relationship where a child feels safe, unquestionably taken care of." Shook did not believe that G.W. bonded with Gray during the first year of her life. She stated that after approximately two years in New Jersey, Gray moved to Denver; during that time, he visited G.W. two to three times per year. According to Shook, while Gray has lived in Seattle, he has visited G.W. three to four times per year and that in the last year, Gray had seen G.W. "[a] little more regularly." When asked, "And if you were to define her world of comfort, who are the people that are involved in her world of comfort right now," Shook replied, "My husband, myself[,] . . . her mother[,] and her [maternal] aunt and her [maternal] uncle." Shook claimed that Gray had not contacted G.W. by telephone on a regular basis and that to her knowledge, Gray had only called G.W. once since she was four years old. When asked what the impact on G.W. would be if she were removed from Shook's home and moved to Seattle, Shook stated:

> It would be devastating at this point in her life. Her world as a five-year-old revolves around her safety and her security. And she already worries and obsesses over things because of the insecurity of her dad in and out of her life. The only thing constant in her life since birth has been my husband and I and her mother has been there as a presence.

Shook stated that her "position is [Gray] should see [G.W.] more often, that he needs to build a relationship and be a full part of her life, not just visit occasionally" and that

4

it would be "devastating to [G.W.]" if Gray were allowed to transport G.W. to Seattle because she had "never been more than a night or two without [Lucy], [Shook,] or [Shook's] husband." According to Shook, no relationship exists between G.W. and Gray; therefore, Gray's visitation should be increased gradually "until [G.W.] feels safe and comfortable with him at [the Shooks'] home in Victoria or other places."

On re-direct examination, Shook stated that although Gray has been interested in visiting with G.W., "[t]he desire for seeing her more than he has been is sudden as of the last hearing." Shook believed that if G.W were transported to Seattle, she could suffer physical harm, such as "stomach [aches], throwing up, grinding her teeth." Shook testified that the trial court had ordered Gray to visit G.W. three times before the end of the year 2007 because Gray had only visited G.W. once that year and that Gray had complied with the order.

Shook denied that she and Lucy "resisted" allowing Gray any visitation time with G.W. and that they had "always encouraged [Gray] to be part of her life." When asked to substantiate her opinion that G.W. would suffer from physical and emotional harm if she were removed from Shook's home, Shook stated that:

> [c]ounselors other than myself, child counselors that [G.W.] has visited with that [sic] has told me this and is willing to testify here today. It's not just my opinion, it's. . . Any adolescent child psychology book that you read, when you take a child's world away from them, the only world that they know, and put them in another world has harmful effects. . . . [And G.W.] would not have family support [if she moved to Seattle]. . . . [Gray] has not one relative that lives in Seattle. [G.W.] in Victoria has a wide family support system and that is the most important thing in her life.

The trial court asked Shook several questions regarding Lucy's parental involvement. In her answers, Shook acknowledged that Lucy does not visit G.W. every day, does not pay any child support to Shook, and that Shook still provides financial support to Lucy. When

5

asked why Shook had possession of G.W., Shook replied:

> Lucy suffers from depression, which she is being treated for and sees a doctor and is trying to get help. She maintains a job fulltime and she struggles to provide a place where [G.W.] can come. She struggles to provide a car. She's having a hard time. And she wants to be a fulltime mother but she feels—and we've always discussed [G.W.] openly between ourselves—and we feel together that it's better not to drag [G.W.] from one place to the other. Lucy visits her at our home and she may financially have to move back into our home with [G.W.].

Shook stated that she believes that G.W. is safer living with her rather than living with Lucy and that she and her husband have been the "only consistent thing" in G.W.'s life.

Green, a licensed clinical social worker,[1] testified that she had been counseling G.W. for two months prior to the trial due to G.W.'s separation anxiety. Green stated that:

> [G.W.] has had several instabilities in her life to date. She's been back and forth with her biological mother and is currently residing primarily with her biological grandmother and step grandfather. There's been inconsistencies due to the mother's difficulties, which have led to some anxieties in this child's life. She has some separation anxiety, she doesn't like to be alone, she's very controlling, she's very needy, needs lots of attention. She won't sleep alone in a room.

According to Green, stability and consistency are very important to a child experiencing anxiety. Green explained that a child G.W.'s age is not able to bond with a person who visits every three to four months and that for bonding to occur, more frequent contact is necessary. When asked whether it is detrimental to a relationship between a child and a parent for there to be infrequent or large gaps between visits, Green replied that it would not affect the relationship in a positive manner and "as far as the two people bonding together, it's going to keep that from happening." She opined that for a child to bond to someone, that person must be consistently in the child's life. Green stated that to

---

[1] There is no evidence that Green had obtained a medical degree, and she did not claim to be a psychologist or psychiatrist.

achieve that level of bonding, the person should have regular communication with the child by mail, telephone, or "face-to-face." Green testified that visits once every two months are inadequate for bonding to occur and that she did not "feel" that G.W. had an adequate bond with Gray, meaning that G.W. "would sense" Gray as a stranger. Green opined that bonding could occur if Gray maintained regular communication. Green stated:

> You know, from what I understand, the only time [G.W.] interacts with [Gray] is when he's here. There's no phone calls, there's no letters, there's no little pictures sent in the mail, none of those things that would be appropriate communication with a four-year-old, which is frequent when parents are geographically distanced, they make the effort to have regular weekly phone contact or some kind of interaction with a child.

According to Green, G.W. considers Shook her "primary parent" and she feels "safe" in Shook's home environment. Green testified that because of G.W.'s separation anxiety, a situation that causes more stress, such as allowing her to leave her home, could cause long-term problems such as "[p]oor performance in school, poor socialization, difficulty in relationships" and more serious problems such as depression and the risk of drug use. Green explained that extended periods of visitation with Gray in Seattle could cause G.W. to "regress, she could become increasingly more anxious and more clingy." Green stated, "I understand that when she's gone on visits in the past with the father she's been throwing up out of anxiety, possibly, since it's been a recurring event."

Green testified that if G.W. was removed from Shook's home, she would "freak out," cling to Shook, cry, scream, and throw up. According to Green, if the visitation schedule "is too accelerated," there could be problems "such as the continued vomiting during visits . . . bed-wetting . . . anxiety . . . . Maybe even she would become more controlling, more bossy, which could cause problems with her peer interaction."

Gray testified that he works for Skansa, USA Building as an engineer and his salary

7

is $85,000 a year. According to Gray, in the past, there has been "some resistance" to his visiting with G.W. and that there was difficulty in exercising his last visitation with G.W. Gray stated:

> The day prior to me making the trip down here I called Lucy, her mother—G.W.'s mother, that is—and inquired where and when I could pick her up, understanding that it was nine, but just to confirm things. And [Lucy] informed me that her daughter was out of town and didn't know exactly when she'd return or where she was at that moment but she would call and inquire into that. And I asked her to finally return my call and let me know what time the next morning I could pick her up and where that would be.

> A few hours later, seven o'clock my time, nine o'clock here, I was getting ready to board an overnight plane flight down here and I called back—I've also called [Shook's] house at that time to see if I could find someone there that could answer that question. Phone calls were not answered, messages were left and I never heard back from them.

> And the next morning on my way down from Houston in a car, after flying in there, I made another round of calls with no answers or return messages. And then later in that morning I got a call from [Shook], informing me that they were in Austin or somewhere in that area and that they were thinking about leaving relatively soon, that they would be down in a few hours.

According to Gray, the visitation that was scheduled to begin at 9:00 a.m. actually began at 1:30 p.m., and he did not make that time up by returning G.W. later. Gray stated that his visitation with G.W. went "exceptionally well," they had a lot of fun together and that he and G.W. have a strong healthy bond and relationship.

Gray testified that he lives with his girlfriend, Allison, in a house he recently purchased and that there is a bedroom for G.W. Gray started a college fund for G.W. and provides health insurance for G.W., which he started doing "immediately following the first month of [G.W.'s] life." Gray claimed that at the time of G.W.'s birth, it was "very unclear who the father was" and that was the reason Lucy carried her own medical insurance during the pregnancy and birth.

Gray stated that he was requesting custody of G.W. because it had become

8

increasingly difficult to be as involved in her life as he would like to be. Gray testified that he had not been aware that G.W. lived with Shook until she filed her petition for intervention; therefore, when he became aware of the situation, Gray decided that he should seek custody of G.W. Gray believed that G.W.'s living conditions were temporary and "evolved out of convenience almost in that Lucy was not taking care of [G.W.] as much as needed . . . ." He also believed that he could provide for G.W. and nurture and love her as much as Shook has. Gray stated:

> Lucy's interest in [G.W.'s] upbringing has not been as we would hope as a parent, and I think that's even gone slightly less over the years and just kind of withered away. I think as a young mother she's been, you know, reluctant to give up parts of her life that, you know, are enjoyed by single people and it's put [G.W.] in an uncomfortable situation there.

On cross-examination, Gray stated that Lucy had not been willing to provide financial support and time to G.W. but that he has done so. Gray stated that he lived in New Jersey for approximately one year and that he would be "hard pressed to recall the exact number" of times he visited G.W., but thought he saw her every two months on average. Gray claimed that at that time, it was difficult to contact G.W., and Lucy made visitation difficult for him by only allowing short, supervised visits with G.W. Gray stated that when he lived in Colorado, he visited G.W. on average every two months. Gray testified that he was unable to visit G.W. on a monthly basis because his employer only allowed ten days of vacation per year and therefore, "[t]here's not that many days in the year vacationwise to do that." On cross examination by Shook's attorney, Gray testified that in order to visit G.W. in Victoria, he is required to take at least "three days of vacation wrapped around a weekend." Therefore, Gray stated, "Ten days of vacation means you do that three times a year, you've used your vacation for that year." Gray also explained

9

that it was expensive to make more visits. When asked if he had "telephone visits" with G.W., Gray replied, "I have in the past had many phone conversations with her. In recent months phone calls are unanswered, unreturned. Phone records could easily indicate the hundreds of phone calls tabbed and made." No phone records were admitted into the record.

Gray admitted that he decided not to look for employment in Texas although he believed that he could have found a job there. When asked why he chose not to live in Texas if his primary consideration was G.W., Gray responded, "I don't believe location is exclusive of visiting my daughter. Those two things don't have to contradict each other in any way." Gray explained that moving to Seattle would allow him more visitation time with G.W. because he made more money and he would never be asked to relocate from Seattle. According to Gray, if G.W. moved to Seattle to live with him, due to the flexibility of his work schedule, he could on certain occasions work from home and would be able to transport G.W. to and from her school.

Gray stated that the reason he could not visit with G.W. more than once every two months is due to her inability to leave Victoria. Gray thought that it would have been better if G.W. had been allowed to travel by plane to visit him in addition to his visits to Victoria. According to Gray, for "close to three years," he attempted to negotiate with Lucy a plan for G.W. to visit him. Gray explained, "I was hoping that we could eventually work something out that was mutually agreeable. Eventually communications have broken down to the point that phone calls are unreturned, unanswered, and they were unbending in their requests and demands." Gray acknowledged that "[v]isitation was highly restrained, but as a mature, responsible parent [he] always hope[d] and [his] goal was that

[he and Lucy] could work out some mutually agreeable terms and conditions of that."

According to Gray, his bond with G.W. is "very strong," but because of the recent "extraordinarily strained" relations, contact with G.W. has not been permitted. Gray testified that when he visited with G.W., she did not demonstrate any behaviors indicating that she was suffering from separation anxiety. Gray stated, "Regarding her getting sick, she's gotten sick one time in my presence. During my last visit I picked her up from dance and she was ill on the way home in the car and recovered within the hour and was playing again." Gray testified that he picked G.W. up at Lucy's residence "a number of times" and also from Shook's residence for visitation. Gray stated that it had been "less than a year" since he picked G.W. up at Lucy's residence.

Gray claimed that he was unaware that G.W. resided with Shook and that his "family [in Victoria] didn't know." When asked, "How hard do you think it would have been had you looked to figure out where the child was living," Gray responded, "How hard would it have been had I looked? I looked as far as I could; that is, she clearly maintained two residences. That is, all of her toys were both at [Lucy's] house and she had a lot of toys at [Shook's] house. As recently as yesterday, for example, [G.W.] stated I live with [Shook]. Oh, I'm not supposed to say that."

Shook's trial counsel asked Gray if he agreed with Green's testimony that it was not in G.W.'s best "interest to be uprooted and moved to Seattle." Gray replied, "I don't sir, in that I believe that she's in a damaging and destructive environment currently and that currently her care is loving and nurturing but a little bit over controlling and possessive in a way that may lead to some of these issues." During re-cross examination, Shook's counsel asked, "Would that be in [G.W.'s] best interest to remove her that distance from

11

the people that have taken care of her during the first five years of her life," Gray replied:

> Taken care of her, I don't really accept how you use the phrase, but I believe it would be in her best interest. They've cared for her and I greatly appreciate what they have done to provide the temporary solution they have. That as a more permanent solution I see her living with one of her parents, and that would be myself if the mother is not taking care of her, which has been the case. So, I believe that it would be in my daughter's best interest to reside with me in Seattle.

When asked if Gray believed he had "stepped up to the plate and assumed the responsibility a parent should," Gray responded,

> Yes, I have stepped up to the plate in that I have consistently been in her life. As soon as I had any indication she wasn't living with her biological parent, I pressed for this, right? That's why we're here today, is because I have been trying to step up to the plate and seek more and more time with G.W. since the day she was born, while they have pushed very hard back against that.

> Gray claimed that immediately after G.W. was born, he initiated some action, which he did not explain, in order to assert his parental rights. Shook's attorney stated, "You haven't done anything to establish rights to possession and access to medical records and to school records, you haven't done any of those things until you filed this lawsuit." Gray replied, "That's not true in that, as stated, right after she was born we sought all those things which you just discussed and . . . ." When Shook's counsel asked Gray to produce the court orders establishing those rights, Gray said, "We could pull them up. There were court orders, there were attorneys involved the month after she was born involving just what you're discussing, sir." Lucy's trial counsel then asked the trial court to take judicial notice of the fact that the pending action was the only suit affecting the parent-child relationship that had been initiated and that it was not filed one month after G.W. was born. Gray then stated, "That's correct, it never reached—it never reached the court at that point, we were negotiating between the attorneys and it was, like I said, a standard parental—I

12

forget the right term for it right now—but acknowledgment of parent, that sort of thing that we went through at that time."

Lucy testified that G.W. lives with Shook and has lived at the Shook residence for approximately one year. Lucy stated that she and Shook decided to share the parental responsibilities because Lucy "needed help raising" G.W. According to Lucy, she was diagnosed with depression when she was in eighth grade, and since then, she has been taking medication for that disease. After G.W. was born, Lucy moved in with Shook and lived there two or three years. Lucy stated that she believes that it is in G.W.'s best interest to continue living with Shook and that she is available to participate in raising G.W.

Lucy denied that she ever prevented Gray from visiting with G.W. and claimed that she "encouraged" him to visit regularly and more often. Lucy stated that it would be better for G.W. if Gray had more contact with her. Lucy also denied that she ignored Gray's telephone calls. Lucy explained that the "supervised" visits occurred when she was breast feeding G.W., which she did for "a little over a year." Therefore, it was "necessary" for her to be present during those visitations. Lucy testified that she did not want to prevent Gray from having visits with G.W. and that she believes it is "very important" for G.W. to visit Gray.

Lucy stated that G.W. was "around" two when Gray moved to New Jersey and that she was not aware of any requests from Gray for G.W. to be flown to New Jersey for a visit. Lucy testified that she has concerns about allowing G.W. to fly to Seattle because she suffers from separation anxiety and she would be scared due to her young age. Lucy agreed that she would work with G.W. to help her overcome her anxiety. However, Lucy did not believe that it would be in G.W.'s best interest for Gray to be appointed sole

13

managing conservator and that it was in G.W.'s best interest to continue living with Shook.

On cross-examination, Lucy said that it was not true that Gray had placed hundreds of telephone calls to G.W. Rather, she testified that before the suit was filed, Gray called approximately twice a month to talk to G.W. Lucy stated that Gray visited G.W. two or three times per year, usually during a holiday like Christmas or Thanksgiving. When asked why Gray did not visit more often, Lucy replied, "I guess numerous reasons, being the expense, the travel expense. Other plans. For example, he had a four-or five-day trip down to Texas over New Year's Eve once and was only in Victoria two days out of that time, the other three days he spent in Austin or Dallas with friends." Lucy believed that Gray's infrequent visits have "damaged" his relationship with G.W.

The trial court appointed Shook managing conservator with the right to determine G.W.'s residence and appointed Gray and Lucy possessory conservators. The trial court ordered that neither possessory conservator live in the same residence with G.W. and Shook. The trial court entered findings of fact and conclusions of law, which stated in pertinent part:

4.    The Court finds that at the time of filing of the Petition in Intervention, Intervenor [Shook] had actual care, control, and possession of the child made the subject of this suit for more than six months ending no more than 90 days preceding the date of filing of the Petition in Intervention.

5.    The Court finds that it is in the best interest of the child made the subject of this suit that [Shook] be appointed Sole Managing Conservator of the child made the subject of this suit.

6.    The Court finds that it is in the best interest of the child made the subject of this suit that [Gray] be appointed possessory conservator of the child made the subject of this suit.

7.    The Court finds that appointment of [Gray] as joint managing conservator of the child made the subject of this suit would not be in

14

the best interest of the child made the subject of this suit because the appointment would significantly impair the child's physical health or emotional development.

Gray requested additional findings of fact "on how appointment of a parent or the parents as sole or joint managing conservator in the instant case would significantly impair the child's physical health or emotional development, including, what facts, if any, in the record, support said findings." The trial court did not make any additional findings of fact, and this appeal ensued.

## II. Standard of Review and Applicable Law

An appellate court reviews the determination of conservatorship under an abuse of discretion standard. *Whitworth v. Whitworth*, 222 S.W.3d 616, 622-23 (Tex. App.–Houston [1st Dist.] 2007, no pet.) (op. on reh'g) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). "Under an abuse-of-discretion standard, legal and factual insufficiency are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion." *Baltzer v. Medina*, 240 S.W.3d 469, 475 (Tex. App.-Houston [14th Dist.] 2007, no pet.); *see also Morris v. Morris*, No. 13-05-00297-CV, 2007 Tex. App. LEXIS 5878, at **6-7 (Tex. App.–Corpus Christi July 26, 2007, no pet.) (mem. op.). The trial court abuses its discretion if its decision is arbitrary or unreasonable. *Whitworth*, 222 S.W.3d at 623. A trial court may also abuse its discretion if it fails to analyze or apply the law correctly. *In the Interest of C.A.M.M.*, 243 S.W.3d 211, 215 (Tex. App.–Houston [14th Dist.] 2007, pet. denied) (citing *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding)). The trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *Whitworth*, 222 S.W.3d at 623.

15

"The presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law." *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990). Therefore, section 153.131 of the family code requires that the parent be appointed sole managing conservator or both parents be appointed joint managing conservators unless the nonparent proves by a preponderance of the credible evidence that "appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development . . . ." TEX. FAM. CODE ANN. § 153.131 (Vernon 2008); *In re De La Pena*, 999 S.W.2d 521, 527 (Tex. App.–El Paso 1999, no pet.). The family code's presumption in favor of parental custody places a "heavy burden on a nonparent seeking custody." *May v. May*, 829 S.W.2d 373, 376 (Tex. App.–Corpus Christi 1992, writ denied). To rebut the presumption, "the evidence must support a logical inference that some specific, identifiable behavior or conduct of the parent will probably cause significant physical or emotional harm to the child." *Id*. at 377. Any "close call" must be resolved in favor of the parent over the nonparent. *Chavez v. Chavez*, 148 S.W.3d 449, 459 (Tex. App.–El Paso 2004, no pet.).

## III. ANALYSIS

Shook relies heavily on Green's testimony that G.W. had suffered from separation anxiety and that because she had not bonded with Gray, it would not be in her best interest to move to Seattle. If the evidentiary burden on a nonparent was *any* evidence of *any* harm to the child, we would be required to find that the trial court acted within its discretion in this case. However, as we discuss below, the law requires the evidence to rise above mere speculation of harm, and further requires the harm to be attributable to a specific,

16

identifiable act or omission of the parent. The trial court abused its discretion, and therefore, we sustain Gray's sole issue, because: (1) Shook failed to offer any evidence of a specific, identifiable act or omission by Gray that would be likely to harm G.W; and (2) the evidence of the general harm caused by "uprooting" in this case is only speculative and therefore could not rebut the parental presumption.

## A. Specific, Identifiable Act or Omission

Gray contends that the trial court abused its discretion because the record does not legally—or even factually—demonstrate specific acts or omissions by Gray that would significantly impair the physical health or emotional development of G.W. We agree.

In order for a nonparent to overcome the presumption that it is in the child's best interest to be in the custody of a parent, there must be evidence of "specific, identifiable" conduct by the parent that is likely to cause harm to the child's physical health or emotional development.[2] In *May v. May*, this Court wrote that the family code

---

[2] The dissent cites three cases from our sister courts to support the proposition that a nonparent may be awarded custody even without a blameworthy act of the parent. Each of those cases is distinguishable from the present case, and moreover, the precedent in those cases is not binding on this Court.

First, in *In re G.R.W.*, the Texarkana Court was dealing with circumstances much different from those in this case. 191 S.W.3d 896, 898-900 (Tex. App.–Texarkana 2006, no pet.). In that case, the father of the child had been indicted for sexual assault of the mother for the very sexual encounter that led to the birth of the child, and the father was convicted of the lesser offense of child endangerment. *Id*. at 898. Moreover, the court pointed to the fact that the father was a smoker and that the child had severe respiratory problems. *Id*. at 900-01. These facts establish specific, identifiable acts of the parent that would be likely to impair the physical health or emotional development of the child. Further, there is no indication that the Texarkana Court relied on the proposition that a nonparent may be awarded custody of a child without a blameworthy act of the parent; the opinion seems to merely state this proposition in dicta. *See id.*

Second, in *In re Rodriguez*, the facts are again distinguishable in a meaningful way from the present case. 940 S.W.2d 265, 266-70 (Tex. App.–San Antonio 1997, writ denied). In that case, the birth mother gave the child up for adoption and relinquished all parental rights, and the father had met the child only twice in the child's life. *Id*. at 267-69. Moreover, there was evidence presented that all interactions and visitations were initiated and facilitated by the child's paternal grandmother, not by the father himself indicating a lack of concern for the child, especially in the child's early life, which the evidence does not support in this case. *Id*. at 269-70. Additionally, the majority for the San Antonio Court wrote that it didn't believe that "[section] 153.131, Texas Family Code contemplates that the environment which 'significantly impairs the child's physical health or emotional development' must be the product of some act or omission on the part of the natural parent," which we consider to be a blatant misstatement of the law. We concur with Justice Carr's dissent insofar as it applies to this case. In response to the majority, Justice Carr wrote:

17

requires evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in significant physical or emotional harm to the child . . . . In other words, the nonparent must usually present evidence affirmatively showing conduct of the parent which will have a detrimental effect upon the child, such as physical abuse, severe neglect, abandonment, drug or alcoholic abuse or very immoral behavior on the part of the parent.

829 S.W.2d 373, 376-77 (Tex. App.–Corpus Christi 1992, writ denied) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990)). In *May*, we ultimately held that the father could not retain custody of the children, but that holding was based on the fact that the father had been a drug user in the recent past, and the holding was only made after a careful and deliberate finding of a specific, identifiable act of the parent that would significantly impair the child's physical health or emotional development. *See id.* at 377-79.

In *Lewelling*, the Texas Supreme Court emphasized the portion of the statute under which a nonparent may obtain custody if "the court finds that appointment of the parent or parents would not be in the best interest of the child because *the appointment would significantly impair the child's physical health or emotional development.*" *Lewelling*, 796

---

[W]hile I agree with the majority that our record reflects "that there is no evidence that any act or omission, behavior, or conduct by [the father] will impair [the child]," I respectfully dissent because, unlike the majority, I do not agree that this case is a case of first impression nor distinguishable from *Lewelling v. Lewelling*, 796 S.W.2d 164 (Tex. 1990). I would hold on this legal issue that *Lewelling* is controlling; and, that at the present time [and] under the current state of Texas laws, the *Lewelling* standard that non-parents seeking custody here cannot benefit from their bonding or attachment with the child by "offering it as some evidence of significant impairment to [the child]." *Id*. at 168. Accordingly, because [the nonparent's] significant impact argument was rejected by our Supreme Court in *Lewelling*, we are required to reject the same argument here.

*Id*. at 275 (Carr, J., dissenting).

Third, in *Chavez v. Chavez*, the mother who was seeking to reacquire custody was shown to be a drug user and there was evidence that she was physically abusive. 148 S.W.3d 449, 453 (Tex. App.–El Paso 2004, no pet.). The El Paso Court overturned the trial court's ruling against the mother on other grounds and never actually reached the issue of whether these specific, identifiable acts or some other reason would prevent the mother from maintaining custody of the children. *Id*. at 459. If the dissent agrees with the reasoning in *Chavez*, it should at least recognize the present case as a "close call," and settle any doubt in favor of the parent, as the El Paso Court required. *See id*.

S.W.2d at 166 (emphasis in original). After emphasizing this specific language, the court instructed that:

> The [statutory] language requiring a showing that appointment of the parent would significantly impair the child's physical or emotional development creates a strong presumption in favor of parental custody and imposes a heavy burden on a nonparent. It is no longer adequate to offer evidence that the nonparent would be a better custodian of the child . . . . [T]he nonparent must affirmatively prove by a preponderance of the evidence that appointment of the parent as managing conservator would significantly impair the child, either physically or emotionally. *This statute thus requires the nonparent to offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child.*

*Id*. (internal citations omitted) (emphasis added). Absent evidence of some specific act or omission by Gray that would cause G.W. harm, the parental presumption can not be overcome. We find no such evidence in the record.

The evidence in this case shows that the only possible harm to the child is the "uprooting" itself—not any specific, identifiable act or omission, conduct or behavior of Gray. Therefore, it was an abuse of discretion for the trial court to name Shook, a nonparent, sole managing conservator of G.W.

**B.      Speculative Harm**

Furthermore, even if we look at general harm, not attributable to Gray's specific acts or omissions, Shook failed to present any evidence that could overcome the parental presumption because the evidence presented raises only speculative harm.

In *May*, this Court wrote that "[the] harm to the child . . . may not be based on evidence which raises a mere surmise or speculation of possible harm." *May*, 829 S.W.2d at 377 (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983); *Briones v. Levine's Dept. Store, Inc.*, 446 S.W.2d 7, 10 (Tex. 1969)).

19

Shook essentially relies on one theory of harm in order to justify the trial court's judgment that Shook had overcome the parental presumption. That theory can be summarized as follows: (1) Green testified that G.W. suffers from "some" separation anxiety; (2) this anxiety has caused "recurring vomiting" in the past, could effect her peer relationships in the future, and may lead to other long-term problems; and (3) these harms can be prevented if G.W. remains with Shook because G.W. feels safe with Shook and G.W. has not bonded with Gray.

Evidence of sporadic, past vomiting and the *possibility* of negative effects on peer relationships is insufficient evidence to rise above a mere speculation of harm. The record indicates that vomiting had occurred on only one or two occasions out of the dozens of times G.W. has met with her father, and on closer review of the record, Green testified that the vomiting was "possibly" caused by anxiety. Moreover, there is no evidence that all of the other alleged dangers to G.W.'s emotional development were more than a mere possibility. For example, on direct examination, when asked, "Can you give the Court some example[s] of what some of those additional problems might be[?]," Green responded, "*sometimes* depression develops, *sometimes* they're at risk for drug use," and further responded, "*oftentimes* we see long-term problems." (Emphasis added). These are the exact types of speculative harms that we prohibited from consideration in *May*. *See May*, 829 S.W.2d at 377. Without consideration of this speculative harm, there is no evidence whatsoever to rebut the parental presumption. Therefore, again, we hold that the trial court abused its discretion in appointing Shook, a nonparent, as G.W.'s sole managing conservator.

## IV. Conclusion

Because we hold that the trial court abused its discretion by appointing Shook to be G.W.'s sole managing conservator, we sustain Gray's sole issue. Having failed to meet her burden, Shook may not maintain any legal custodial rights over G.W. "In most circumstances, a judgment is reversed and rendered when a legal sufficiency challenge is sustained." *Chavez*, 148 S.W.3d at 461. However, we are permitted to remand a case such as this "when the interest of justice so requires." *Id.* (citing TEX. R. APP. P. 43.3). In this case, the trial court held in Shook's favor, making it unnecessary for that court to determine G.W.'s best interest as it related to the custodial or visitation rights that should exist between Gray and Lucy only. Because of this, and because we have overturned the trial court's ruling designating Shook as sole managing conservator, we find it to be in the interest of justice not to simply render judgment in Gray's favor. Further, more than a year has passed since the custodial hearing; circumstances may have changed during this time such that it would not be in G.W.'s best interest to appoint Gray as her sole managing conservator, and we have no ability to determine the present circumstances of any of the parties, nor do we have the luxury of sitting as a fact-finder. For the forgoing reasons, we remand this case to the trial court for custodial hearings to determine the rights as between Gray and Lucy only.

_____
GINA M. BENAVIDES,
Justice

Dissenting Opinion by
Justice Linda Reyna Yañez.

Delivered and filed the
30th day of November, 2010.

21