

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | No. 08-23-00087-CV |
| IN THE INTEREST OF | § | Appeal from the |
| R.W.N.R., | § | 90th Judicial District Court |
| a Child. | § | of Stephens County, Texas |
| | § | (TC# CV32590) |

## O P I N I O N

In this original suit affecting the parent-child relationship, Appellant Hope Svoboda, mother, appeals the trial court's order appointing her and Appellee Tamara Beth Busby, grandmother, joint managing conservators of R.W.N.R., Hope's son, and awarding Tamara the exclusive right to designate his primary residence. In this appeal, Hope argues that the trial court abused its discretion in granting Tamara rights over Hope's objection because the evidence is legally and factually insufficient to overcome the constitutional and statutory fit-parent presumptions. For the reasons set forth below, we reverse.

### STATEMENT OF FACTS

R.W.N.R. was born in June 2012. Hope took care of him until September 2013. Hope testified that almost a year following R.W.N.R.'s birth, after experiencing depression, anxiety, and irritability, she was diagnosed with untreated or misdiagnosed post-partum depression. Around the

same time, Hope both lost her grandmother, who was her mother figure, and Hope's husband filed for divorce.[1]

Hope and Robert divorced at the end of 2013, but for reasons not relevant to this appeal, the divorce decree was set aside. Believing she was divorced, Hope left R.W.N.R. in his father's care while she pursued other relationships. Up until Robert's trial, Hope's relationship with Robert was "an on-again/off-again thing," and Hope would live with Robert and R.W.N.R. intermittently in their home. When Hope was home with R.W.N.R.'s father, she would take care of R.W.N.R. Tamara lived next door to them and had daily contact with the child. In 2018, while Hope was living with Robert and R.W.N.R., R.W.N.R. began counseling sessions with Jeanene Poston, a licensed clinical social worker.[2] At the time, Robert "was facing some pretty serious legal charges, and [R.W.N.R.] was struggling with adjustment and attachment issues." Poston testified that the problems stemmed from his difficulty adjusting amid his father's legal troubles and his mother being in and out of the home. Thereafter, R.W.N.R. was diagnosed with a generalized anxiety disorder that manifests as food aversion—one of the only ways in which a child can exert any control. From 2018 to 2019, Poston worked with Hope, Robert, and R.W.N.R. to treat the child's anxiety. Hope left for New Mexico in May of 2019, around the time of Robert's trial, at the advice of Robert's attorney (according to Hope), which set R.W.N.R. back in his "abandonment schema and part of his detachment disorder."

---

[1] Hope testified that in October 2013, CPS put a safety plan in place, which Hope was released from the next month, and there has not been any CPS intervention ever since.

[2] In terms of "working on developing relationships and helping Hope to reattach to and bond with her son," Poston testified that in 2018, she "thought [Hope] was making good progress and she was invested."

R.W.N.R.'s social worker continued to work with him as well as Tamara because R.W.N.R. began to live with her once Robert was incarcerated.[3] Hope returned to Breckenridge around August or September, after R.W.N.R.'s school started, but then moved to Wharton, Texas to live with her aunt, Tina, with whom she currently resides. According to Hope, the members of her "support group" live in Wharton, and she would not have support in Breckenridge because of her strained relationship with Tamara. Hope petitioned for a divorce from Robert in January of 2020, and the case was consolidated with this suit affecting the parent-child relationship (SAPCR), in which Hope indicated her expectation that she and Robert would enter into an agreement regarding R.W.N.R.'s conservatorship, care, and support. Tamara intervened in the suit, seeking managing conservatorship of R.W.N.R. On March 25, 2020, the court signed temporary orders naming Hope and Tamara temporary joint managing conservators, giving Tamara exclusive rights to determine the child's residence, consent to care, and other decisions, while Hope had access to R.W.N.R. supervised by his maternal aunt. Pursuant to the parties' temporary orders, R.W.N.R. stays with Hope in Wharton during her periods of possession.

Hope is legally blind and unable to drive, so she relies on her aunts, uncles, and cousins, all of whom resided at some point with Tina, to drive her to the location where Hope and Tamara would exchange R.W.N.R. Tina and the other family members have all collectively participated in child-rearing whenever R.W.N.R. has been with Hope in Wharton, although Hope is with R.W.N.R. most of the time while R.W.N.R. is in Wharton. At trial in October 2022, testimony from Hope and her family members reflected that Hope has bonded with R.W.N.R., whom she disciplines appropriately during their time together, and that she cooks and cleans. Hope also proffered pictures of R.W.N.R. looking happy with family members while in her care, baking

_____

[3] Robert was sentenced to incarceration for a period that will surpass R.W.N.R.'s minor years.

cookies with Hope during Halloween, partaking in an Easter meal, completing school assignments, attending the zoo with his friend, and posing in front of a submarine on which his grandfather served. Hope further testified that her activities with R.W.N.R. have included going to the movies, the zoo, museums, parks, and shopping, among other things. Additionally, Hope has tended to R.W.N.R.'s medical and dental needs. Specifically, she took him to the hospital and stayed with him there when he had appendicitis. And she took him to the dentist when he had a tooth abscess. Hope indicated that over the last three years, her bonding with R.W.N.R. "has been interrupted due to having to bring him back so many times. It would be easier to strengthen that bond if he was with me all the time." Hope indicated that at times, Tamara has restricted her communication with R.W.N.R. to "every five days." Hope also voiced her concern about Tamara as a caregiver based on problems she had as a result of the way Tamara treated her when she was a child. Hope further noted that Tamara is in bad health, which makes it hard for her to care for R.W.N.R. Tamara testified that she has severe anemia, but has never "passed out."

Poston testified that on one occasion, following a summer-long stay with Hope, an increasingly anxious R.W.N.R. complained about the food protocols at Hope's home and complained about Tina being overbearing.[4] Poston opined that Tamara "tries to be very consistent in the home," and it would be in R.W.N.R.'s best interest to live with Tamara versus Hope because he feels comfortable with Tamara, and stability—that is, keeping him in the same community,

---

[4] Poston stated: "He was increasingly more anxious. His sleep was disturbed. He was tearful." According to Poston, R.W.N.R.'s anxiety was propelled by Tina serving him a plate of food for dinner and the family expecting him to sit and eat with the family, "which is not part of the protocol"; the protocol at Tamara's home allows the child to have more control over what goes on his plate. The expectations around food consumption and the types of food R.W.N.R. is given are different at the two homes. Poston testified that R.W.N.R. is very sensitive and nervous and indicated that R.W.N.R. had grievances about Tina—the authoritarian in Hope's home. And she further testified that R.W.N.R. is actually with Hope most of time when he is at her home, as Tina works. While both Poston and Hope spoke about what R.W.N.R. told each of them, the court indicated that due to hearsay, "I'm not going to take either one of them as part of evidence."

school, church, etc., where he has bonds and attachments—is "extremely" important for someone with anxiety. Poston also testified that if R.W.N.R. were to live with Hope, it would be helpful for Hope to participate in his treatment, and Poston could send her notes to a counselor in Hope's area. Tamara testified about her close relationship with R.W.N.R. She indicated that she has been his primary caregiver since 2019 and believes that Hope has not demonstrated that she is self-sufficient and can adequately care for R.W.N.R. on her own. Poston testified that R.W.N.R.'s best interest is served by awarding primary custody to Tamara because of the stability she has provided him and her participation in counseling with him. She testified that Hope's appointment as managing conservator would lead to physical and emotional harm to R.W.N.R. First, Hope failed to follow the proper protocol for feeding a child with food aversion, which Poston claimed might lead to unnecessary weight loss. Second, a change in R.W.N.R.'s environment—particularly, his school, his church, and his support system—might cause increased anxiety and, in turn, exacerbate his food aversion. Because Hope has a past history of leaving the child, Poston concluded that the child's best interest is served by leaving him with Tamara, who has proven to be the only consistent figure in his life.

At trial, Hope requested sole managing conservatorship. Following trial, the court issued findings of fact and conclusions of law, which included in relevant part:

> 4. [R.W.N.R.] has lived solely with Tamara continually since May 1, 2019. Further, Tamara was caring for [R.W.N.R.]'s daily physical and psychological needs, and exercised guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents with their children, for most of [R.W.N.R.]'s life, even when Hope was in the home. Tamara has been the only consistent, and stable person in [R.W.N.R.]'s life.

> 5. Hope has not shown the ability to provide for herself and the child, or that she has done so, at any point in the child's life. In addition, Jeanene Poston, Clinical Social Work/Therapist, LCSW testified that it would significantly impair the child's physical health or emotional development to be in Hope's custody because

of limitations Hope has. Hope has failed to even try to obtain a job, or home, during the entire time this suit has been pending.

For these reasons, in the final order, the court named Hope and Tamara joint managing conservators of R.W.N.R. and Robert possessory conservator with no specific rights. The order gave Hope standard possession for conservators residing over 100 miles apart and carried through many of the temporary orders. The exclusive right to determine the child's residence remained with Tamara, while the court removed the requirement that visits with Hope be supervised. Hope appealed, contending that (1) she was entitled to the constitutional fit-parent presumption, and (2) Tamara failed to meet her burden under the Texas Family Code to show that appointing Hope as sole managing conservator would significantly impair R.W.N.R.'s physical health or emotional development in order to overcome the statutory fit-parent presumption.

## STANDARD OF REVIEW

We review a trial court's order granting conservatorship to a nonparent under an abuse-of-discretion standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court abuses its discretion if it acts arbitrarily or unreasonably without reference to any guiding rules or principles. *Interest of M.T.*, No. 11-17-00340-CV, 2019 WL 1291246, at *2 (Tex. App.—Eastland Mar. 21, 2019, no pet.) (mem. op.). Under this standard of review, the fact that a trial court judge might resolve a matter within her discretion differently than an appellate court judge does not demonstrate abuse of discretion. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). Moreover, challenges to the legal or factual sufficiency of the evidence do not constitute separate grounds of error. *Interest of G.L.H.*, 630 S.W.3d 309, 313 (Tex. App.—Eastland 2021, pet. denied). Instead, the reviewing court incorporates the sufficiency analysis into its analysis of abuse of discretion by conducting a two-part inquiry: (1) Did the trial court have

sufficient evidence upon which to exercise its discretion? (2) Did the trial court err in its exercise of that discretion*? In re A.J.E.*, 372 S.W.3d 696, 698–99 (Tex. App.—Eastland 2012, no pet.).

The first part of this inquiry implicates the traditional sufficiency review. When we conduct a legal sufficiency review, we determine whether the evidence would enable a reasonable fact-finder to reach the decision under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). This means that we view the evidence in the light most favorable to the trial court's order and indulge every reasonable inference that supports it. *Id.* at 822. We credit any evidence that is favorable to the trial court's decision and disregard any contrary evidence unless a reasonable fact-finder could not do so. *Id.* at 827. A challenge to the legal sufficiency of the evidence succeeds in four circumstances:

    (1)    the record discloses a complete absence of evidence of a vital fact;

    (2)    the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact;

    (3)    the only evidence offered to prove a vital fact is no more than a mere scintilla; or

    (4)    the evidence conclusively establishes the opposite of a vital fact.

*Bien v. Bien*, 365 S.W.3d 492, 495 (Tex. App.—Eastland 2012, no pet.). If more than a scintilla of evidence supports the trial court's finding, the challenge to legal sufficiency fails. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

When we review a trial court's decision for factual insufficiency, the question is whether the court's findings are so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. *Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 160 (Tex. App.—Eastland 2009, pet. dism'd). Because we are not the fact-finder, we defer to the trial court's judgment on issues of credibility and refrain from substituting our judgment for that of the

trier of fact, even if we would reach a different answer upon review of the evidence. *City of Keller*, 168 S.W.3d at 816–17, 822.

## ANALYSIS

In one issue on appeal, Hope argues that the trial court abused its discretion in granting Tamara rights over Hope's objection because the evidence is legally and factually insufficient to overcome the constitutional and statutory fit-parent presumptions. We analyze each presumption separately, asking whether there is some probative evidence in the record to support the trial court's finding that the parental presumption was rebutted in this case and whether the court's finding is against the great weight and preponderance of the evidence.

### A. Constitutional Fit-Parent Presumption Under *Troxel* and *In re C.J.C.*

Hope's first point of error is that appointing Tamara as managing conservator violates her due process rights under the Supreme Court of the United States' decision in *Troxel v. Granville*, 530 U.S. 57 (2000) to make decisions regarding R.W.N.R. We agree.

It is axiomatic that parents have a fundamental right to the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). From this rule of law, the Supreme Court of the United States has deduced that a fit parent's determination of their child's best interest is accorded "special weight" because it is presumed that a fit parent acts in the best interest of their child. *Id.* at 69. The Court synonymized parental fitness with providing "adequate care." *Id.* at 68. In the Court's words, "so long as the parent adequately cares for his or her child (i.e., is fit), there will normally be no reason for the State to . . . question the [parent's ability] to make the best decisions concerning the rearing of that parent's children." *Id.* at 68–69. Thus, in *Troxel*, where the grandparents of a child whose mother was a fit parent asked the court for visitation rights, the

8

Court found that mother's decision as to the frequency of such visitation should have been given special weight since it was presumed that she was acting in her child's best interest. *Id.* at 72.

The Texas Supreme Court recognized the fit-parent presumption in *In re C.J.C.*, 603 S.W.3d 804 (2020). There, the Texas Supreme Court reinforced the fit-parent presumption in the context of a conservatorship dispute. *Id.* at 807. The Court held that when a nonparent requests appointment as managing conservator in addition to or in lieu of a natural parent, the best interest of the child—the primary consideration in conservatorship determinations—is "embedded with the presumption that it is the fit parent . . . who makes the determination whether to allow that request." *Id.* at 820. "*In re C.J.C.* extended the fit parent presumption to apply to a parent who had been named as the child's managing conservator in a previous order in custody modification proceedings involving private parties"; thus Hope, who in the temporary orders was named joint managing conservator along with Tamara, is entitled to the fit-parent presumption. *In re B.B.*, 632 S.W.3d 136, 140 (Tex. App.—El Paso 2021, no. pet.).

Since the Texas Supreme Court's decision in *In re C.J.C.*, courts have been unable to articulate the degree or quantum of evidence required to overcome the fit-parent presumption. *In re C.J.C.*, 603 S.W.3d at 823 (Lehrmann, J., concurring); *Interest of A.V.*, No. 05-20-00966-CV, 2022 WL 2763355, at *5 (Tex. App.—Dallas July 15, 2022, no pet.) (mem. op.) (citing *In re C.D.C.*, No. 05-20-00983-CV, 2021 WL 346428, at *2 (Tex. App.—Dallas Feb. 2, 2021, no pet.) (mem. op.)). *Troxel* and subsequent Texas cases do instruct, however, that the fit-parent presumption is not overcome if the nonparent shows that the parent has failed to adequately care for the child. *See Troxel*, 530 U.S. at 68 (defining "fitness" as providing adequate care); *In re C.D.C.*, 2021 WL 346428, at *6 ("[T]he existence of the fit-parent presumption necessarily requires that some evidence that a parent is not fit must be offered to rebut it."); *Interest of A.V.*,

9

2022 WL 2763355, at *5 ("To prove Mother unfit here, Grandparents had the burden to prove that Mother cannot adequately care for A.V.").[5]

In making this determination, courts have understood that the relevant time period for assessing parental fitness is the present. *Interest of S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). But evidence of a parent's distant past conduct—for example, from two or three years before trial—coupled with more recent transgressions can support a finding of parental unfitness. *See Danet v. Bhan*, 436 S.W.3d 793, 797 (Tex. 2014) (holding there was some evidence in the record to support the jury's finding that mother was not fit to be appointed sole managing conservator where she had a criminal record, used drugs, failed to provide a stable home, and abandoned the child in the last two or three years, and she more recently failed to visit or communicate with the child and engaged in illegal misconduct). While the "length of time required to ameliorate a history of bad conduct" has not been delineated, it is a "purely contextual" question that is "subject to the good judgment of the fact-finder at trial." *Id.* at 797–98. Nonetheless, past

---

[5] Because the dissent views *In re C.J.C.* as distinguishable, it does not burden Tamara with having to overcome the constitutional fit-parent presumption in this case on the basis of the § 102.003(a)(9) standing provision. The case upon which the dissent relies, *Interest of H.S.*, addresses standing, which itself does not include a requirement to overcome a fit-parent presumption. *Interest of H.S.*, 550 S.W.3d 151, 152, 154 (Tex. 2018) (reversing the court of appeals' holding that "standing under § 102.003(a)(9) cannot be gained by a nonparent exercising care, control, and possession over a child in the absence of evidence that the child's parent is unfit or has abdicated his or her own care, control, and possession over the child to the nonparent for the statutory period"). But the dissent's reasoning, i.e., that "[b]ecause the standing provision on which Tamara relies does not require her to additionally establish Hope's lack of fitness, I see no legal basis to apply it," does not follow from *Interest of H.S.*, as the court did not reach the merits of the conservatorship determination in that case. *Id.* at 163. (finding that the grandparents fell into the narrow Family Code class of nonparents who served in a parent-like role over a period of time and attained standing, but not considering or expressing any opinion as to the merits of the grandparents' claims that they should be awarded managing conservatorship). While an individual who attains standing under the more stringent Texas standing statute (as opposed to the "breathtakingly broad" statute in *Troxel*) may very well have more of an argument that the parent is unfit under certain circumstances, we do not conflate the legal standards of standing versus merits. *See Interest of H.S.* at 162 ("Nor does section 102.003 govern the merits of a SAPCR; again, the statute addresses only who may file a suit affecting the parent-child relationship, not what a petitioner must show to obtain the relief she seeks."); *see also In re B.A.B.*, No. 07-21-00259-CV, 2022 WL 1687122, at *4 (Tex. App.—Amarillo May 26, 2022, no pet.) (mem. op.) (recognizing same).

conduct alone is not sufficient to demonstrate parental unfitness. *Interest of S.T.*, 508 S.W.3d at 492.

Although the line between parental fitness and unfitness is thus far ill-defined, we find that there is no evidence in the record that Hope is presently an unfit parent or has been an unfit parent within the almost three years from the time she filed the SAPCR to the time of trial. Accordingly, she is entitled to the fit-parent presumption. In reaching the opposite conclusion, the trial court found "Hope has not shown the ability to provide for herself and the child[] or that she has done so[] at any point in the child's life," and Tamara has assumed all parental responsibilities. Additionally, the court found that Hope has failed to obtain a job or a home during the pendency of this suit.

While maintaining employment and a home has been cited by courts as some evidence of parental fitness, as measured in the present time, these factors are not necessary markers thereof. For example, in *Interest of A.V.*, the Dallas Court of Appeals held that grandparents who cared for their granddaughter for most of the child's life and were asking for sole managing conservatorship failed to show that mother was unfit and therefore not entitled to the parental presumption where they argued that based on the mother's history, neither mother's employment nor her relationship to her fiancé would last. 2022 WL 2763355, at *5. The court found that, in fact, the only evidence presented on those issues established the opposite of unfitness: mother had a steady job with substantial income, was engaged to be married, and was living in a home that she leased with her fiancé. *Id.* The court noted that mother's past actions in allowing the grandparents to care for her daughter could not, standing alone, support a finding that mother was unfit at the time of trial. *Id.* at *5. Nevertheless, even when mother had relied on the grandparents' help in the past in obtaining housing and other provisions during her periods of financial or emotional instability, the court

found that by doing so, mother ensured that her child was adequately cared for and thereby acted in her child's best interest. *Id.* at *6.

The Dallas Court of Appeals illustrated two points applicable here. First, the question under the constitutional fit-parent presumption is not whether a parent was, at some point in the distant past, unable to adequately care for their child, but whether they are *presently* fit do so. Like the child in *Interest of A.V.*, R.W.N.R. has been fed, housed, and cared for exclusively by his grandmother at times in the past. But just as the Dallas Court of Appeals cabined its analysis of parental fitness to the mother's circumstances at the time of trial, and not solely to her period of instability in the past, we are resolved to look for evidence of *present* parental unfitness that would support the trial court's findings. And while evidence of parental unfitness might be found in Hope's more distant past, i.e., before the SAPCR filing, that past conduct alone cannot support the trial court's finding almost three years later that Hope cannot adequately care for R.W.N.R. today.

Second, neither the lack of home ownership nor a lack of employment serve as sufficient evidence to overcome the presumption of parental fitness where the parent demonstrates that she can adequately care for the child by other means—for example, by utilizing an existing support system comprised of close relatives. As the court in *Interest of A.V.* recognized that a parent can act in her child's best interest while lacking in financial stability and relying on help from extended family, we, too, are careful not to hold that not having a job or a home on one's own, without more, is legally sufficient evidence to support a finding of parental unfitness.[6] We have previously stated that "[c]ustody disputes by their very nature are inherently fact-intensive." *In re De La Pena*, 999

---

[6] Relatedly, as discussed in further detail below, the Texas Supreme Court has held that in analyzing whether the parental presumption was rebutted under the Texas Family Code, evidence that a parent was unemployed at the time of trial and was living in "crowded conditions" with other family members was not sufficient evidence of significant impairment to the child's physical health or emotional development. *Lewelling v. Lewelling*, 796 S.W.2d 164, 165 (Tex. 1990).

S.W.2d 521, 529 (Tex. App.—El Paso 1999, no pet.). As such, best-interest determinations require a contextual analysis of the evidence, for "[s]ometimes, evidence might be misleadingly suggestive of parental unfitness when viewed in isolation or unexplained." *In re A.J.D.-J.*, 667 S.W.3d 813, 836 (Tex. App.—Houston [1st Dist.] 2023, no pet.). Thus, we look for any probative evidence in the record that, when viewed in context, supports the trial court's finding that Hope cannot presently adequately care for R.W.N.R. And in so doing, we hold that there is legally and factually insufficient evidence to support this conclusion.

When viewed in the context of the relevant time frame for determining parental fitness, i.e., the present, the record contains uncontroverted evidence that during her time of unemployment, Hope has been going to school to obtain better employment prospects. She is presently in a position to obtain a job with her current level of schooling. She provides R.W.N.R. housing with the help of her aunt and receives support for other child-rearing responsibilities from other members of her extended family. Hope manages her own financial accounts and pays rent to her aunt. Even were she to live alone, she would, to some extent, continue to need assistance from her extended family, as she is legally blind and not allowed to drive. Thus, she relies on her aunt, uncle, and cousins to drive her to the parties' exchange location and to other destinations. Her aunt has agreed that Hope will have continued support if R.W.N.R. were to live with Hope.

Additionally, since her appointment as joint managing conservator under the trial court's 2020 temporary order, Hope has provided R.W.N.R. medical attention when he has been ill, has cooked and cleaned for him, and has bonded with him over family meals and activities. In other words, Hope is not homeless, has not abdicated her parental duties since being appointed joint managing conservator of R.W.N.R., and has not otherwise neglected or endangered R.W.N.R. *Cf. In re B.B.*, 632 S.W.3d 136, 141 (Tex. App.—El Paso 2021, no pet.) (finding that the question of

father's fitness was at issue, and there was legally sufficient evidence that supported the trial court's appointment of the Texas Department of Family and Protective Services as temporary managing conservator where father had been couch surfing to avoid homelessness, had a criminal record and a history of domestic violence, and had only limited visits with the child in the last six years). To echo the court in *Interest of A.V.*, the fact that Hope has sought and obtained a support system through extended family is not evidence of unfitness because in so doing, she ensured that R.W.N.R. was adequately cared for and thus acted in his best interest. *See Interest of A.V.,* 2022 WL 2763355, at *6 (stating the same about mother in that case). Accordingly, the trial court's findings—namely, that Hope has not proven that she is able to provide for herself or her child because of her unemployment and failure to obtain a home—are contrary to the overwhelming weight of the evidence. The evidence establishes the opposite: that Hope has adequately provided for R.W.N.R. since her appointment as joint managing conservator in 2020.

Importantly, Tamara has not alleged that Hope's current home is unsafe or unstable. The crux of her argument is that Hope has not cultivated a safe or stable environment for R.W.N.R. *on her own.* Rather than demonstrate parental unfitness, this fact merely speaks to the reality of many American families wherein single parents increasingly rely on people outside the nuclear family "to assist in the everyday tasks of child rearing." *Troxel v. Granville*, 530 U.S. 57, 64 (2000). And the need for such assistance rings especially true for parents whose disabilities pose unique challenges to parenthood—as it has in this case, where Hope's family has had to facilitate the visitations between her and R.W.N.R due to Hope's blindness. But "limitations" that are precipitated by a parent's disability are not evidence of parental unfitness, particularly where the parent demonstrates that they can accommodate their needs to enable them to care for their children. *See In re L.D.F.*, 445 S.W.3d 823, 831 (Tex. App.—El Paso 2014, no pet.) ("[W]e

14

recognize that a parent's mental illness diagnosis alone does not necessarily demonstrate that a child's physical health or emotional development will be significantly impaired by parental custody.").

Lastly, while Tamara has undoubtedly served the role of a parent to R.W.N.R., she recognizes that the child is bonded with his mother and wishes for him to have a good relationship with Hope—negating concerns of parental unfitness. *See In re B.A.B.*, No. 07-21-00259-CV, 2022 WL 1687122, at *6 (Tex. App.—Amarillo May 26, 2022, no pet.) (mem. op.) (stating that the evidence confirms grandparents' belief that father was a fit parent because they wanted father to be in the child's life and to bond with the child). Whether R.W.N.R. is "better off" with Tamara as a managing conservator is not for us to say, nor is it the controlling question. *See In re C.J.C.*, 603 S.W.3d 804, 807 (Tex. 2020) ("The government may not 'infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a better decision could be made.'" (quoting *In re Derzapf*, 219 S.W.3d 327, 333 (Tex. 2007) (per curiam))); *see also In re B.A.B.*, 2022 WL 1687122, at *5 (recognizing same). Because there is no evidence to suggest that Hope is presently unfit, and because the evidence instead shows that Hope has adequately cared for R.W.N.R. since 2020, we conclude Hope is entitled to the constitutional fit-parent presumption: she is presumed to act in R.W.N.R.'s best interest, and her decisions regarding conservatorship are accorded special weight. We therefore sustain Hope's first point of error.

### B. Parental presumption under Texas Family Code § 153.131

Additionally, Hope argues that Tamara did not meet the Texas Family Code § 153.131 requirement to overcome Hope's statutory fit-parent presumption, i.e., to show that appointing Hope as sole managing conservator would significantly impair R.W.N.R.'s physical health or emotional development. We agree.

The presumption that a child's best interest is served when custody is awarded to a natural parent is "deeply embedded in Texas law." *Lewelling*, 796 S.W.2d at 166. Accordingly, the Texas Family Code creates a parental preference, providing that a parent "shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." TEX. FAM. CODE ANN. § 153.131(a). The statute also presumes that the best interest of the child is served when both parents are appointed joint managing conservators. *Id.* § 153.131(b). This presumption applies anytime a nonparent is seeking appointment as managing conservator. *Critz v. Critz*, 297 S.W.3d 464, 471 (Tex. App.—Fort Worth 2009, no pet.). But this presumption is rebuttable. We have recognized that a fit parent's wishes are not absolute. *In re B.B.*, 632 S.W.3d at 139. Thus, even when a fit parent's objection to a nonparent's request for custody is given special weight, a nonparent can overcome the presumption by proving by a preponderance of the evidence that there is a history of family violence or that the appointment of a parent as a managing conservator would significantly impair the child's physical health or emotional development. TEX. FAM. CODE ANN. § 153.131(a)–(b); *Id.* § 105.005; *see also In re C.J.C*, 603 S.W.3d at 821 (Lehrmann, J. concurring) (stating that § 153.131 of the Texas Family Code provides a standard for resolving the question of when a trial court can award custody to a nonparent over the fit parent's objection). The trial court must make specific factual findings to support its conclusion that the presumption has been rebutted; failing to do so constitutes error. *Interest of A.V.*, 2022 WL 2763355, at *6.

The burden of overcoming this presumption is a heavy one. *In re A.D.A.*, No. 11-12-00002-CV, 2012 WL 4955270, at *2 (Tex. App.—Eastland Oct. 18, 2012, no pet.) (mem. op.). The nonparent must point to specific and identifiable behavior, in the form of an act or omission by the parent, that will cause the harm outlined in the statute. *Id.* at *3. For example, courts have found

16

that the presumption is rebutted when there is evidence of "physical abuse, severe neglect, abandonment, drug or alcohol abuse, or very immoral behavior on the part of the parent." *Id.* (citing *Gray v. Shook*, 329 S.W.3d 186, 197 (Tex. App.—Corpus Christi 2010), aff'd in part, rev'd in part, 381 S.W.3d 540 (Tex. 2012)).

The presumption is not rebutted where the evidence raises "a mere surmise or speculation of possible harm." *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied). The Eastland Court of Appeals has found the presumption rebutted where a nonparent presents evidence of actual harm to the child and where that harm is traceable to the parent's conduct and not to the child's anxiety over a possible uprooting. *See In re K.P.O.*, No. 11-98-00269-CV, 2000 WL 34234982, at *6 (Tex. App.—Eastland Feb. 3, 2000, no pet.) (not designated for publication) (distinguishing other cases where the presumption was not rebutted because no actual harm to the child was shown); *In re A.D.A.*, 2012 WL 4955270, at *4 (finding that harm deriving from uprooting the child is not harm traceable to the parent and is therefore not evidence of significant impairment sufficient to rebut the parental presumption). A nonparent fails to overcome the statutory parental preference by merely showing that they are a better custodian of the child. *Lewelling*, 796 S.W.2d at 167.

Finally, as discussed above, a parent's past conduct alone is not sufficient to prove a parent unfit, but it may be relevant if used to infer a person's future conduct and thereby gauge present parental fitness. *In re De La Pena*, 999 S.W.2d at 528; *In re K.P.O.*, 2000 WL 34234982, at *4. While there is no fixed time period for how far back in time a parent's conduct can be used to inform courts of the parent's present fitness, it is irrefragable that "if the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling." *In re K.R.B.*, No. 02-10-

17

00021-CV, 2010 WL 3928727, at *5 (Tex. App.—Fort Worth Oct. 7, 2010, no pet.) (mem. op.) (citing *May*, 829 S.W.2d at 377).

Proving "significant impairment" that rises above speculation of possible harm requires a showing of specific behavior traceable to the parent's unfitness, as measured in the present time, and not solely to uprooting the child from his or her environment. *In re A.D.A.*, 2012 WL 4955270, at *4. In *In re A.D.A.*, the trial court appointed the maternal aunt and father as joint managing conservators and granted the aunt the exclusive right to determine the child's primary residence. *Id.* at *1. The child had a developmental disorder, which, according to a psychologist who testified on behalf of the maternal aunt, might cause the child to react violently or to "shut down completely" if he were uprooted from his home. *Id.* at *4. As for physical impairment, the psychologist agreed that any prediction of physical problems the child could develop would be speculative at best. *Id.* He testified that although removing a child from his home is a traumatic experience, he would find it hard to believe that the child could not eventually acclimate or "regain whatever he loses during that period [of transition]." *Id.* Additionally, both the aunt and the psychologist agreed that anyone could learn to properly care for the child. *Id.* The aunt testified to one occasion when the child urinated and defecated on himself before going to court and seeing his father but stated that the child often has accidents whenever he is anxious or nervous. *Id.* The thrust of her testimony was that the child would suffer from separation anxiety and nervousness were he removed from her home. *Id.* In reversing the trial court's appointment of the aunt as the primary managing conservator, the court opined that the harm relayed by the aunt and the psychologist was merely speculative and that there was no specific act or omission by the father that would cause harm to the child. *Id.*

18

In reaching its conclusion that the possibility of harm stemming from uprooting a child did not rebut the presumption, the court relied on the Thirteenth Court of Appeals' decision in *Gray*, 329 S.W.3d at 186. There, the child's parents had been in and out of her life since the child's birth, and the grandmother's home was the only stable and consistent home the child had ever known. *Id.* at 188. Given the inconsistent parental presence, the child developed separation anxiety, and the licensed clinical social worker hypothesized numerous risks to the child's health that would result from uprooting the child, including vomiting, bed-wetting, crying, screaming, poor socialization and school performance, and increased clinginess. *Id.* at 190–91. In fact, the social worker testified that the child had already been vomiting, possibly from her anxiety over visits with her father. *Id.* at 191. Nonetheless, the court held that the grandmother did not rebut the statutory parental presumption. *Id.* at 196–99. The only harm identified was from the uprooting itself, and such harm was merely speculative, as evidence of the child's sporadic vomiting was only "probably" linked to anxiety, and other evidence was merely a possibility. *Id.* at 198.

The evidence in this case similarly demonstrates mere speculation of possible harm not attributable to Hope's conduct since her appointment as joint managing conservator in 2020. The trial court entered findings of fact and conclusions of law wherein it found that the statutory presumption had been rebutted because of the "limitations Hope has." Without elaborating on what those "limitations" are, the court cited the testimony of the licensed clinical social worker, who stated that Hope failed to follow the proper protocol for feeding a child with food aversion. Specifically, instead of allowing the child to dictate his own portions at dinner, the child was pre-served and made to eat a "good portion" of what was on his plate, lest he be given time-out and made to sit at the base of the stairs. The social worker informed the court that given the child's diagnosis, punishment around food is improper, and if this behavior continued, the food aversion

19

could worsen. After pointing out a picture of the child that was received as an exhibit, the social worker further testified that the child was already underweight, and exacerbating his anxiety by uprooting the child could lead to further weight loss. In response, Hope stated that she did not know about any protocol the child was following with Tamara in her home. She averred that had she known about the food protocols, she would have implemented them.[7] Instead, Hope and her family traditionally eat dinner together as a family, and R.W.N.R. is fed what Hope considers to be organic and healthier food than what Tamara feeds R.W.N.R. at Tamara's home.

Assuming the social worker was qualified to make any statement about the child's physical health and weight, there is no evidence in the record to suggest that Hope's dinner regimen has aggravated R.W.N.R.'s food aversion. The social worker's testimony about the possibility of future weight loss caused by anxiety-induced food aversion is speculative; there is no evidence that the child has, in fact, lost weight because of anything that Hope has done or failed to do. Moreover, the record is devoid of evidence that Hope's current dinner regimen for R.W.N.R. has caused him significant emotional impairment. Just as the facts of *Gray* and *In re A.D.A* revealed, uprooting children from their environments may cause anxiety-related symptoms in young children. *Gray*, 329 S.W.3d at 198; *In re A.D.A.*, 2012 WL 4955270, at *4. But if those symptoms are not traceable to the parent's present unfitness—as measured by their recent conduct in the form of a specific act or omission—then such evidence will not rebut the parental presumption. *Gray*, 329 S.W.3d at 198; *In re A.D.A.*, 2012 WL 4955270, at *4. Here, R.W.N.R.'s food aversion predates this SAPCR, and while a possible uprooting might cause further complications with the child's anxiety, there is no other evidence to suggest that Hope's acts or omissions in the past three

---

[7] Poston testified that after Hope left, and once she no longer had unsupervised visits with R.W.N.R., Tamara took over and Poston never reached out to Hope to speak with her or involve her in R.W.N.R.'s therapy.

years since her appointment as managing conservator have caused the child physical or emotional harm.

More important, according to the social worker, is the risk of emotional harm to R.W.N.R. that might arise from uprooting the child from his currently stable environment. She stated that while she "can't tell the future," a change in R.W.N.R.'s environment—particularly, the school that he is well-adjusted to, the church he regularly attends with Tamara, and his consistent support system—might exacerbate the child's food aversion issue and cause a dip in school performance, the latter of which has already happened. Thus, R.W.N.R.'s anxiety is best treated in a stable environment, Poston testified, as one that Tamara has provided since 2019. In fact, Tamara argues, and the court found, that the statutory presumption was rebutted because Tamara has been the only consistent parental figure in R.W.N.R.'s life. While that may be true, the test in Texas is not the fitness or degree of competence, or even excellence, of the nonparent custodian in terms of caring for the child, but whether appointment of the natural parent as managing conservator will cause significant impairment. TEX. FAM. CODE ANN. § 153.131. We will not find the presumption was rebutted just because Tamara may be a better parent. *See Lewelling*, 796 S.W.2d at 166 ("'[W]hile there might be a lot of reasons appointment of a parent would not be in the best interest of the child, only one suffices to rebut the parental preference.'" (quoting 89–1 State Bar Section Report—Family Law 27 (J. Sampson ed. 1989))). Further, while Hope's long-term history of providing stability for R.W.N.R. contains bouts of her absence from his day-to-day life before she filed the SAPCR in 2020, her past conduct alone is not determinative of parental unfitness. *In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.). There is no evidence in the record that since Hope's re-entry into R.W.N.R.'s life as managing conservator in 2020, she has been an inconsistent presence or that she has faltered in executing her parental responsibilities.

21

*See Interest of A.V.*, 2022 WL 2763355, at *5 (stating that mother's "past actions, standing alone, cannot support a find that [m]other was unfit at the time of trial"); *cf. Gray*, 329 S.W.3d at 188–89, 196 (finding that a father who had very little, sporadic visitation with his daughter, who lived in another state, and who did not keep in constant virtual communication with his child was still entitled to the parental presumption).

Even if R.W.N.R. would arguably suffer some emotional impairment from a change in conservatorship, Tamara offered no evidence to suggest that such impairment would be "significant," as the statute requires. Courts have found that in a few cases, emotional impairment can be inferred from uprooting a child from the only home or family they have known when doing so would be akin to "psychological amputation." *Interest of Rodriguez*, 940 S.W.2d 265, 273–74 (Tex. App.—San Antonio 1997, no writ). And that was the case for a child whose only family she had ever known in her first two years of life was her foster family and whose biological father had only visited her twice in those formative years. *Id.* at 271–74. But even in those cases, courts have required a showing of how the harm to the child would be significant. *In re J.C.*, 346 S.W.3d 189, 194 (Tex. App.—Houston [14th Dist.] 2011, no pet.). By contrast, Hope and R.W.N.R. have already bonded, and there is no similar risk of emotional impairment akin to psychological amputation. Like the aunt and psychologist in *In re A.D.A.*, who agreed that anyone could learn to care for the child's special needs, here, the social worker acknowledged that R.W.N.R.'s can be treated by any licensed clinician, and Hope agreed to continuing therapy and implementing a proper regimen to treat R.W.N.R.'s anxiety. As such, the record discloses no evidence of significant impairment that would result from Hope's appointment as sole managing conservator.

We hold that there is legally insufficient evidence in the record to show that granting Hope sole managing conservatorship would significantly impair R.W.N.R.'s physical health or

emotional development. As such, we hold that the trial court abused its discretion in granting Tamara joint managing conservatorship with the right to designate the child's primary residence. We sustain Hope's second point of error.

## CONCLUSION

Because we hold that the trial court abused its discretion, we reverse the trial court's order appointing Tamara joint managing conservator with the exclusive right to determine R.W.N.R.'s primary residence.

We acknowledge that close to a year has passed since the trial court issued its order, and this Court has "no ability to determine the present circumstances of . . . the parties, nor do we have the luxury of sitting as a fact-finder." Therefore we find it in the interest of justice to remand the case for the trial court to make a determination regarding conservatorship of, possession of, and access to R.W.N.R., to the extent Tamara continues to pursue the same. In doing so, however, the trial court may consider only the circumstances since the time of trial.[8] Should the trial court determine that Tamara remains unable to overcome the fit-parent presumptions, on remand the trial court may consider whether and to what degree Tamara should have possession of or access to R.W.N.R. in accordance with § 153.433 of the Texas Family Code.[9]


LISA J. SOTO, Justice

October 25, 2023

---

[8] In *Shook v. Gray*, 381 S.W.3d 540, 542-43 (Tex. 2012), the Texas Supreme Court affirmed in part and reversed in part the court of appeals' decision in *Gray v. Shook*, 329 S.W.3d 186, 199 (Tex. App.—Corpus Christi-Edinburg 2010). *Shook*, 381 S.W.3d at 542-43 (affirming the court of appeals' remand to the trial court but reversing it to the extent it limited the remand to the trial court's consideration of grandmother's rights; though the grandmother "failed to present evidence capable of overcoming the parental presumption, it does not follow that she will necessarily be unable to overcome the parental presumption under the present circumstances").

[9] TEX. FAM. CODE. ANN. § 153.433 (addressing possession of or access to grandchild).

Before Rodriguez, C.J., Palafox, and Soto, JJ.
Palafox, J., dissenting