

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

## No. 02-23-00121-CV

———————————————

IN THE INTEREST OF S.C. AND T.C., CHILDREN

---

On Appeal from the 481st District Court
Denton County, Texas
Trial Court No. 20-5352-362

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

In two issues, Denise Clark appeals from the trial court's order appointing her mother Hannah Clark and stepfather Derek Clark as managing conservators of her children, Sheri Clark and Tami Clark.[1] Denise contends that the trial court abused its discretion because Derek and Hannah failed to offer sufficient evidence to prove that she was not a fit parent and to prove that appointing her as managing conservator would significantly impair the children's physical health or emotional development. We affirm the trial court's order.

## I. Background

Denise gave birth to Sheri in 2018 and to Tami in 2019 while living with Derek and Hannah. All three continued to live with Derek and Hannah until May 2020, when they moved in with the children's father (Father) at his mother's house. Less than two months later, Denise moved in with her biological father. It is not clear from the record whether the children accompanied her in this move.

Around the time that Denise moved in with her biological father, Derek and Hannah filed a petition seeking sole managing conservatorship of Sheri and Tami. Derek and Hannah also sought a temporary restraining order and writ of attachment for possession of the children. Denise and Father filed an answer and counterpetition seeking to be named joint managing conservators. The trial court granted Derek and

---

[1]We use aliases to refer to the children and their family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

Hannah's request for an attachment and temporary restraining order and set a hearing to determine further temporary orders. At the hearing, the trial court granted Denise virtual (Zoom) visits with the children and continued the hearing to allow Denise to hire counsel. Denise moved in with her maternal grandmother Carol Turner about a year later.

The case stalled for two years until Denise filed an amended counterpetition on August 10, 2022, alleging that the appointment of her and Father as joint managing conservators would not be in the children's best interest and seeking sole managing conservatorship.[2] Denise also sought a temporary restraining order to obtain possession of the children. The trial court denied Denise's request for a temporary restraining order. The trial court held a temporary-orders hearing on September 20, 2022, and granted Denise supervised visitation with the children.

On January 11, 2023, the trial court held the final hearing[3] at which Derek, Hannah, Denise, and Carol testified. The trial court issued a written order on February 28, 2023, appointing Derek and Hannah as sole managing conservators and granting Denise unsupervised visitation as a possessory conservator.[4] Denise requested, and the

---

[2]Father did not join this pleading.

[3]Father did not appear at the final hearing.

[4]The trial court's order also appointed Father as a possessory conservator but denied him access to the children. This appeal does not concern the trial court's rulings on Father's counterclaims, which were denied, or possession and access to the children.

trial court filed, findings of fact and conclusions of law. Relevant to this appeal, the

trial court made the following findings:

- "In the three to four years that the children have been alive, [Denise] has not had any consistent, stable, gainful employment."

- "In the three to four years that the children have been alive, [Denise] has had, at best, about three to four months' worth of employment."

- "[Denise] was not working nor earning an income as of the date of the final trial."

- "[Denise] is capable of working . . . but has chosen not to."

- "[Denise] has not been employed for at least several months."

- "[Denise] did not get a job between the temporary[-]orders hearing held on September 20, 2022[,] and the trial on January 11, 2023[,] because of 'the holidays . . . and spending time with the girls.'"

- "[Denise] testified she starts a job cleaning houses 'tomorrow,' and that she is enrolled in online classes."

- "[Denise] does not have her own place of residence . . . [but] resides with her maternal grandmother."

- "[Denise's] maternal grandmother, [with] whom she resides, is selling her residence because she cannot afford it currently."

- "The heat is not functional in the room that [Denise] would purportedly have the children reside in."

- "[Denise] doesn't know the plan for her maternal grandmother's residence after it is sold; she doesn't know exactly where they would live."

- "[Denise] does not know what school the children would attend if they were to reside with her." "[Denise] is happy with where the children go to school now, based on [Derek] and [Hannah's] residence."

4

- When this suit was filed, "the children were residing with [Denise] in the children's paternal grandmother's home."

- "The paternal grandmother did illegal drugs in that residence, as did the children's father . . . ."

- "[Denise] permitted [Father] to use illegal drugs openly, knowingly, and in front of the children."

- "[Denise] admitted not stopping [Father] from using marijuana when the children were present."

- "[Denise] has used electronic cigarettes (vaping devices) around the children." "[Sheri] picked up the vape device and put it in her mouth while with [Denise], in a behavior that mimicked [Denise]." "[Derek] removed the vape device from [Sheri's] mouth."

- "[Denise] has engaged in acts of physical violence with [Father] wherein she was both the victim and the aggressor."

- "Some of the family violence that took place between [Denise] and [Father] took place in front of the children; both [Denise] and [Father] were aggressors at times."

- "When [Denise] and [Father] engaged in acts of family violence in front of the children, the children were scared and would scream and cry."

- "[Denise] visits with the children at her parents' house regularly, for a few hours at a time."

- "[Denise] has a history of getting agitated with the children, as well as an inability to care for both children at the same time. [Denise] also has a history of not completely nor properly caring for them when they are sick."

- "[Denise] does not take the children to doctor's appointments or to school."

The trial court concluded that its order was in the children's best interest. This appeal followed.

## II. Discussion

In two issues, Denise contends that the trial court abused its discretion by appointing Derek and Hannah as managing conservators because they failed to offer sufficient evidence to prove that she was not a fit parent and to overcome the parental presumption under Texas Family Code Section 153.131(a). *See* Tex. Fam. Code Ann. § 153.131(a) (requiring a parent to be appointed sole managing conservator unless court finds that the appointment would significantly impair the child's physical health or emotional development). Although Denise presents these as two separate issues, the second issue encompasses the first. *See In re C.J.C.*, 603 S.W.3d 804, 818–19 (Tex. 2020) (orig. proceeding) ("[W]e read any best-interest determination in which the court weighs a fit parent's rights against a claim to conservatorship or access by a nonparent to include a presumption that a fit parent acts in his or her child's best interest."); *In re S.T.*, 508 S.W.3d 482, 491–92 (Tex. App.—Fort Worth 2015, no pet.) (considering acts or omissions constituting significant impairment under Section 153.131(a) as evidence of parental unfitness). Thus, we need only address Denise's second issue. *See* Tex. R. App. P. 47.1.

### A. Standard of Review

We review a trial court's order appointing a nonparent as managing conservator for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court

6

abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

A trial court abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But no abuse of discretion occurs when the trial court decides based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact findings on disputed issues are not conclusive, and when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Id.*

In family law cases, however, the abuse-of-discretion standard of review overlaps with the traditional sufficiency standard of review; thus, legal and factual insufficiency

7

are not independent reversible grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Neyland v. Raymond*, 324 S.W.3d 646, 649 (Tex. App.—Fort Worth 2010, no pet.).

Accordingly, to determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) did the trial court err in its application of that discretion? *Id.* The applicable sufficiency review comes into play in the first question. *Id.* at 649–50. We then proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* at 650; *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

Anything more than a scintilla of evidence is legally sufficient to support a finding. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727–28 (Tex. 2003). More than a scintilla exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). On the other hand, no more than a scintilla exists when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence. *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 397 (Tex. 2019); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the

credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## B. Applicable Law

A court's primary consideration when determining conservatorship is the child's best interest. Tex. Fam. Code Ann. § 153.002; *J.A.J.*, 243 S.W.3d at 614. When determining a child's best interest, courts consider what are commonly referred to as the *Holley* factors—a nonexhaustive list of considerations for determining a child's best interest. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). Relevant to this appeal, these factors include (1) the emotional and physical danger to the child now and in the future, (2) the parental abilities of the individual seeking custody, (3) the plans for the child by the individual seeking custody, (4) the stability of the home, (5) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (6) any excuse for the acts or omissions of the parent. *Id.*

But because parents have a fundamental right to the care, custody, and control of their children, a fit parent's determination of her child's best interest carries "special weight," and it is presumed that a fit parent acts in the best interest of her child. *Troxel v. Granville*, 530 U.S. 57, 66, 68–69, 120 S. Ct. 2054, 2060, 2061–62 (2000). "[S]o long

9

as a parent adequately cares for his or her child (*i.e.*, is fit), there will normally be no reason for the State to . . . question the [parent's ability] to make the best decisions concerning the rearing of that parent's children." *Id.* at 68–69, 120 S. Ct. at 2061–62. Thus, "[w]hen a nonparent requests conservatorship or possession of a child, the child's best interest is embedded with the presumption that it is the fit parent—not a court— who makes the determination whether to allow that request." *C.J.C.*, 603 S.W.3d 820.

In an original suit affecting the parent–child relationship, such as this one, Section 153.131 of the Texas Family Code applies this presumption by requiring a parent to be named managing conservator "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam. Code Ann. § 153.131(a); *see also C.J.C.*, 603 S.W.3d at 821 (Lehrmann, J., concurring).

To rebut this presumption, the nonparent seeking custody must identify some act or omission committed by the parent to demonstrate that naming the parent as managing conservator will significantly impair the child's physical health or emotional development. *S.T.*, 508 S.W.3d at 491 (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 167– 68 (Tex. 1990)). This may be "physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent." *Id.* at 492. But a court may also consider "parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, and

chaotic lifestyle that has put and will continue to put the child at risk." *Id.* The court should consider the parent's conduct at the time of trial. *Id.* Although past conduct may not be sufficient alone to show a parent's unfitness at the time of trial, "an adult's future conduct may well be measured by his recent deliberate past conduct as it may relate to the same or a similar situation." *In re V.S.*, No. 02-18-00195-CV, 2018 WL 6219441, at *10 (Tex. App.—Fort Worth Nov. 29, 2018, no pet.) (mem. op.) (citing *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied) (op. on reh'g)). Evidence linking the parent's conduct to the prospective harm to the child must rise above mere speculation and surmise. *S.T.*, 508 S.W.3d at 492–93.

## C. Evidence

The evidence presented in this case was almost exclusively testimonial. The trial court was the sole judge of the witnesses' credibility and the weight given to their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

Much of the testimony at the final hearing recounted the testimony purportedly offered at the September 2022 temporary-orders hearing.[5] The final-hearing testimony concerned Derek and Hannah's care for the children, past conflicts between Denise and Father, Denise's lack of employment and stable housing, Father's drug use and Denise's vaping, and Denise's college enrollment. The trial court heard additional

---

[5]Although Denise contends that we cannot rely on testimony from the September 2022 hearing, the record contains no transcript of this hearing, which the trial court clerk has confirmed was not recorded. Thus, we do not, and cannot, rely on this testimony.

testimony about changes in Denise's living conditions, employment, and college enrollment, and her visits with the children since the September 2022 hearing. Specifically, the trial court heard the following relevant testimony:

- Denise testified that she had been unemployed since before the temporary-orders hearing. She did not specify whether this was the July 2020 hearing or the September 2022 hearing, and Derek testified that Denise had not been gainfully employed since the children were born.

- Denise further testified that there was nothing preventing her from getting a job and agreed that it would have been important for her to get a job to show that she was attempting to improve her circumstances.

- Denise claimed that "spending time with the girls, the holidays, [and] trying to finish up school" prevented her from getting a job between the September 2022 hearing and the January 2023 final hearing. The trial court questioned how the holidays had interfered, especially when "retailers are hiring and restaurants are busy," and Denise responded, "Just spending time with the girls. That's what I was more focused on, I guess." She spent three to five hours a day playing and watching movies with the children at Derek and Hannah's house.

- Denise acknowledged that caring for children requires money and claimed that she had made money from "side jobs" cleaning houses and "helping

12

organize things" for family members and that she had a part-time job cleaning houses starting the day after the final hearing. According to Denise, she would be working three to four days a week for $13.00 an hour.

- When asked whether she had any money in a bank account, Denise offered only that she had "about [$]3,000 from school." Carol likewise testified that Denise received money through school and had a new job cleaning houses, which is what Denise had experience doing.

- Denise planned to live with Carol while working part-time, caring for the children, and attending college full-time to pursue an early-education degree. She acknowledged that she would be increasing her academic workload and taking on a new job while caring for the children for the first time.

- Denise knew that Father had smoked marijuana while the children were with them—before Derek and Hannah filed this suit—and that she took no action to address the situation. She asserted, however, that she had not spoken with Father outside of court for about two or three years.

- When asked for her thoughts on the children's schooling, Denise said, "I think it's important," and that she thought that she should get to decide where they attend. She said that she was "okay with [the daycare]" where they were "go[ing]" at the time of trial.

- When asked about her then-current housing, Denise testified that she had been living with Carol for a year, that Carol's house was up for sale, and that she planned to move with Carol after the sale.

- Carol testified that Denise had been living with her for a year and a half and that Denise would stay with her after the house sold. Carol, who had been a middle-school teacher for twenty-six years, said that Denise was a good mother who played with and cared for the children when they were permitted to visit Carol. Carol also testified that Denise had been dating a man who lived out-of-state, that Denise had visited him twice, and that he had visited Denise for several days right before the final hearing.

- Derek and Hannah testified that the children had been living with them since they were born, except for a short period when they moved with Denise to Father's mother's house. Recounting his concerns that led him and Hannah to seek custody, Derek testified that both Father and his mother smoked marijuana and took other drugs and that Father had used drugs while with the children and that Denise had permitted it. Hannah corroborated this testimony.

- Derek also said that Denise was not good with money, had not been gainfully employed since the children were born, was not employed as of the September 2022 hearing, was not employed as of the January 2023 final

14

hearing, and did not have her own residence. He was concerned that Denise would have no place to go if there were a conflict between her and Carol. Hannah was also concerned that Denise might not have a place to stay once Carol's house was sold.

- Derek testified that when Denise was living with them, there had been frequent physical conflicts between Denise and Father. The altercations happened in front of the children, and Derek had to remove Father from the house on one such occasion. Hannah testified that both Father and Denise were aggressors in these conflicts. According to Hannah, the children "would scream and cry and . . . just try to run to whoever because they were scared and didn't know what to do." Derek last saw Father with Denise about a year before the final hearing.

- Derek recounted a situation in which Sheri had mimicked Denise by putting Denise's vape pen in her mouth. Derek witnessed it and took the pen away from Sheri. This happened while the children were with Denise right before Derek and Hannah filed this suit.

- Derek admitted that Denise visited the children every day. Hannah said that Denise is a good person but lacked some skills such as employment and money management. She also said that Denise was good to the children but that she could do more when they are sick. Hannah had offered to let Denise

take the children for doctor's visits, but Denise declined. She also claimed that Denise would get "agitated with them quite a bit" and "couldn't take both of them at night." Denise also did not take the children to school.

- Derek confirmed that virtually nothing had changed with respect to the parties' or children's circumstances since the September 2022 hearing. Hannah was concerned that Denise had done nothing for two years to get the children back, concluding, "It was comfortable for [Denise], because it worked for her to be able to go and hang out with her friends." She continued, "[S]everal times she would be with us and she would leave. And then, like, the kids and us would be begging her to stay, but she would go with her friends and, like, even though I would, like, get upset and stuff . . . ."

## D. Analysis

The various issues addressed by the witnesses boil down to one multi-faceted issue: Whether Denise's failure to get a job, obtain independent housing, and exhibit parenting skills while Derek and Hannah acted *in loco parentis* for two years is sufficient evidence to divest Denise of managing conservatorship. The trial court highlighted this issue during closing arguments, noting that Denise did not attempt to regain custody of the children for two years following the July 2020 hearing and questioning Denise's willingness to supervise the children, as exhibited by Sheri's attempted use of Denise's vape pen. The trial court also questioned how Denise could care for the children when

16

she had been living with family members and had held only odd jobs since the children were born, concluding, "[W]here are the priorities?"

The record supports the trial court's concerns. From at least 2018, when Sheri was born, until January 2023, Denise had no steady employment. Her only excuse for failing to get a job between September 2022 and January 2023 was that it was the holiday season and she was finishing school and spending time with the children. She offered no excuse for failing to get a steady job in the preceding four years since Sheri's birth. Yet she spent three to five hours a day visiting the children at Derek and Hannah's house and found time to pursue personal interests. The trial court could reasonably have found that Denise willfully failed to get a steady job in the four years since Sheri's birth and that this prevented her from also obtaining stable, independent housing. *See Pool*, 715 S.W.2d at 635 (holding that a finding will not be set aside if credible evidence supporting it is not so weak or so contrary to the overwhelming weight of all the evidence that it should be set aside).

Notably absent from the record is any evidence that Denise had taken parenting responsibility for the children, other than spending time with them daily. Instead, Derek and Hannah had been parenting the children, and Denise even declined the opportunity to do so when Hannah offered. There is no evidence in the record that Derek, Hannah, or Carol had agreed to care for the children while Denise was working and in school or how Denise would pay for daycare if she could not get assistance. Nonetheless, Denise testified that—despite having not done so in the past—she

17

planned to work part-time while increasing her academic workload to full-time[6] and caring for the children. The trial court was in the best position to judge Denise's credibility, and we will defer to that judgment. *See Jackson*, 116 S.W.3d at 761.

The record also reflects that Denise had permitted drug use around the children and had failed to adequately supervise them when she last had custody. Although these events happened two years before the final hearing, that was only because Denise took no action to obtain custody in that two-year period. Indeed, the record contains no evidence that Denise sought to modify or to pursue mandamus relief from the July 2020 temporary orders. *See In re Strickland*, 358 S.W.3d 818, 820 (Tex. App.—Fort Worth 2012, orig. proceeding) (holding that mandamus is appropriate to challenge temporary orders). Thus, with this evidence and the evidence concerning Denise's circumstances at the time of trial, there is some evidence rebutting the parental presumption. *See Danet v. Bhan*, 436 S.W.3d 793, 797 (Tex. 2014) (holding that acts and omissions from two or three years before trial combined with more recent acts and omissions was some evidence showing substantial impairment).

Denise cites several cases to demonstrate that the evidence is insufficient to show significant impairment under Section 153.131(a). But these cases concern facts not at

---

[6]Although the record reflects that Denise had been enrolled in school in Fall 2023, there is no evidence of when she started school or when she planned to complete her degree.

18

issue here, such as the parent's geographic location,[7] the child's possible separation anxiety as the sole alleged impairment,[8] a parent who was escaping an abusive relationship,[9] and parents who had improved their circumstances and demonstrated parenting skills.[10] Denise cites four more cases for the proposition that courts have

---

[7]*Whitwell v. Whitwell*, 878 S.W.2d 221, 223 (Tex. App.—El Paso 1994, no writ) (holding that evidence that allowing child to move to Australia to live with mother who was Australian citizen was insufficient to show significant impairment).

[8]*Gray v. Shook*, 329 S.W.3d 186, 198 (Tex. App.—Corpus Christi–Edinburg 2010), *aff'd in part, rev'd in part*, 381 S.W.3d 540 (Tex. 2012) (holding that possible separation anxiety was mere speculation of impairment).

[9]*Lewelling*, 796 S.W.2d at 167–68 (holding that evidence that abused mother was unemployed and living in "somewhat" crowded conditions with family members at the time of the custody hearing was insufficient to show significant impairment, noting that grandparents could not "benefit from the abuse endured by [mother] at the hands of their son by offering it as some evidence of significant impairment to their grandchild").

[10]*S.T.*, 508 S.W.3d at 497–98 (holding that evidence of past criminal conduct and drug use was insufficient to show significant impairment because at the time of trial, father "had an appropriate house and income appropriate for the child's care" and had completed parenting classes, and no witness testified that father lacked any parenting skills); *In re K.R.B.*, No. 02-10-00021-CV, 2010 WL 3928727, at *12 (Tex. App.—Fort Worth Oct. 7, 2010, no pet.) (mem. op.) (holding evidence of past criminal conduct and drug use insufficient to show significant impairment considering other evidence that mother had been off drugs for years, had completed parenting classes, was gainfully employed, and partially paid child support); *Critz v. Critz*, 297 S.W.3d 464, 476–77 (Tex. App.—Fort Worth 2009, no pet.) (holding that evidence that mother's employment with parents of her new partner, with whom she had a child, in exchange for room and board was insufficient to show significant impairment in light of other evidence including mother's demonstrated parenting skills and two social workers' reports voicing no concern over child's physical health or emotional development); *In re W.G.W.*, 812 S.W.2d 409, 414 (Tex. App.—Houston [1st Dist.] 1991, no writ) (holding that evidence was insufficient to show significant impairment on record indicating, among other things, that mother had left her transient lifestyle and multiple "male

19

found parents to be fit despite "far more evidence than that presented . . . in this case."

These cases are also distinguishable because they concern either a nonparent's failure

to produce any evidence to support her allegations,[11] a parent who had improved his

circumstances,[12] and a parent who had already been appointed managing conservator.[13]

Thus, none of these cases are helpful to our analysis.

---

friends" for a long-term relationship with another person whom she planned to marry); *Neely v. Neely*, 698 S.W.2d 758, 760 (Tex. App.—Austin 1985, no writ) (holding in appeal from divorce judgment that evidence of housing conditions during the marriage was not sufficient to show detrimental effect on child in light of other evidence that such issues were symptomatic of "a relationship that [was] not going well" and that mother was preparing to move out of family member's house and into her own).

[11]*In re B.F.*, No. 02-20-00283-CV, 2020 WL 6074108, at *3 (Tex. App.—Fort Worth Oct. 15, 2020, orig. proceeding) (mem. op.) (holding that intervenor failed to produce evidence to support her allegations that the father was unfit).

[12]*In re S.K.*, No. 13-19-00213-CV, 2020 WL 4812633, at *5 (Tex. App.—Corpus Christi–Edinburg Aug. 13, 2020, pet. denied) (mem. op.) (holding that no evidence supported appointment of nonparent as possessory conservator in termination suit in which DFPS ultimately recommended father be appointed sole managing conservator, father had completed his service plan, and parties presented no evidence that father contributed to conditions necessitating DFPS intervention).

[13]*In re B.A.B.*, No. 07-21-00259-CV, 2022 WL 1687122, at *6 (Tex. App.—Amarillo May 26, 2022, orig. proceeding) (mem. op.) (holding that nonparents failed to produce evidence overcoming presumption that father, who had already been appointed joint managing conservator with his ex-wife (who later died), was unfit and that appellate argument that father was unfit solely because he attended Alcoholic Anonymous meetings and did not contact DFPS after learning that it was investigating his wife was unsupported by any allegations or evidence); *In re N.H.*, 652 S.W.3d 488, 495, 498 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (holding that trial court's finding mother unfit directly contradicted its appointing her sole managing conservator and nonparent's evidence consisting only of her testimony "as to what would happen if she were removed from the [c]hild's life" was insufficient to show substantial impairment).

20

The Eighth Court of Appeals recently issued an opinion concerning a grandparent's appointment as managing conservator that illustrates the boundaries of the parental presumption. *See In re R.W.N.R.*, No. 08-23-00087-CV, 2023 WL 7012655, at *1 (Tex. App.—El Paso Oct. 25, 2023, no pet.). In *R.W.N.R.*, Hope and Robert Svoboda had unsuccessfully attempted to divorce in 2013, a year after R.W.N.R. was born. *Id.* Believing that she was divorced, and after several personal crises, Hope left R.W.N.R. with Robert intermittently while she pursued other relationships. *Id.* R.W.N.R.'s grandmother Tamara Beth Busby lived next door and cared for him while Hope was away. *Id.* R.W.N.R developed attachment issues that flared up when, on advice of Robert's counsel, Hope left for New Mexico during Robert's trial on criminal charges in May 2019. *Id.* Hope returned to Texas three months later but went to live with an aunt in South Texas. *Id.* Robert was incarcerated, so R.W.N.R. remained with Tamara in North Texas. *Id.* In 2020, Hope reinitiated her divorce action and consolidated it with the SAPCR from the prior, unsuccessful divorce. *Id.* Tamara intervened and was appointed joint managing conservator with Hope and was given the exclusive right to designate the child's primary residence. *Id.*

The trial court found that R.W.N.R. had been living with Tamara continually since May 2019, that Tamara had been parenting R.W.N.R. and caring for his physical and psychological needs for most of his life, "even when Hope was in the home," and that Tamara was "the only consistent, . . . stable person in [R.W.N.R.]'s life." *Id.* at *2. The trial court also found that Hope had "not shown the ability to provide for herself

and the child," nor had she "done so . . . at any point in the child's life," noting that Hope had "failed to even try to obtain a job[] or home[] during the entire time this suit has been pending." *Id.* at *3. The trial court cited R.W.N.R.'s therapist's opinion that R.W.N.R.'s physical health or emotional development would be significantly impaired if he were "in Hope's custody because of limitations Hope has." *Id.*

Reversing the trial court's order, the Eighth Court of Appeals noted that Hope was legally blind and relied on family members for transportation. *Id.* at *2. While she had been unemployed, Hope had completed schooling that qualified her for employment. *Id.* at *7. Although she relied on her aunt for housing and other family members for childcare, Hope managed her own finances and paid rent to her aunt. *Id.* Even if she lived alone, Hope would remain dependent on family for transportation because she was legally blind and could not drive. *Id.* Hope had also provided medical care to R.W.N.R., including taking him to the dentist for an abscess and staying with him in the hospital when he had appendicitis. *Id.* at *2. She had cooked and cleaned for him and had bonded with him over family meals and activities. *Id.* at *7. Thus, the court concluded that Hope had "not abdicated her parental duties since being appointed joint managing conservator of R.W.N.R." *Id.*

Addressing the parental presumption under Section 153.131(a), the court noted that the only evidence of possible harm was speculative. *Id.* at *10. Specifically, the therapist asserted that Hope's failure to follow certain treatment protocols "could" exacerbate R.W.N.R.'s conditions. *Id.* Yet, there was no evidence that Hope's acts or

omissions since her managing-conservator appointment had caused any physical or emotional harm. *Id.* Moreover, there was evidence that the therapist had failed to notify Hope about the treatment protocols because the therapist had stopped communicating with her at some point. *Id.* at *10 n.7. The court concluded that "while Hope's long-term history of providing stability for R.W.N.R. contains bouts of her absence from his day-to-day life before she filed the SAPCR in 2020, her past conduct alone is not determinative of parental unfitness" and that there was no evidence that "since Hope's re-entry into R.W.N.R.'s life as managing conservator in 2020, she has been an inconsistent presence or that she has faltered in executing her parental responsibilities." *Id.* at *10. Thus, the court reversed the trial court's order. *Id.* at *11.

Although both Denise and Hope were unemployed and living with family members at the time of their respective trials, the similarities between them end there. Hope was disabled and would always be dependent on family to some degree. *Id.* at *7. Regardless, she managed her own finances and paid rent to her aunt. *Id.* In contrast, Denise admitted that she was not disabled and that there was no reason that she could not work. There is no evidence that she paid rent to Carol or had the means to do so. At the time of trial, Hope had completed her education and was qualified to work. *Id.* The record here reflects that Denise had attended one semester as of the final hearing, and there is no evidence indicating when she would complete her early-education degree. Although she alleged that she had a job starting the day after the hearing, it was a job cleaning houses, not in early education.

23

More importantly, Hope had improved her circumstances since Tamara first started caring for R.W.N.R. and had exhibited parenting skills during the pendency of the suit. *Id.* at *2. In contrast, the only actions that Denise had taken to improve her circumstances since Sheri's birth in 2018 was starting school a few months before the final hearing and purportedly obtaining a part-time house-cleaning job. There is no evidence that she exhibited any parenting skills, even declining to do so when invited.

Finally, the evidence of possible harm in *R.W.N.R.* was speculative and concerned only R.W.N.R.'s special needs, of which Hope may not have been aware. *Id.* at *10 & n.7. Here, the evidence of possible harm is reflected in events that took place when Denise last had custody and concern the children's physical and emotional well-being. Thus, the trial court could have reasonably concluded that, unlike Hope, Denise had faltered in executing her parental responsibilities.

The Seventh Court of Appeals arrived at a similar conclusion in *In re C.R.T.* on facts like those at issue here. 61 S.W.3d 62, 67 (Tex. App.—Amarillo 2001, pet. denied). In *C.R.T.*, an aunt attempted to obtain permanent managing conservatorship over her nephew who had been living with her. *Id.* at 64–65. In affirming the trial court's appointing the aunt as managing conservator, the court noted, among other evidence, that nothing "prevented [the mother] from earning a wage sufficient to assist in the provision of her children" and characterized her failure to do so as "a refusal to obtain paying employment and, thereby, support her children." *Id.* at 67. The court also noted that the mother had testified that "her parents would provide the needed finances[,]

24

that she intended to live with her children in her parents' three[-]bedroom house 'forever,'" and that she had failed to investigate her children's medical condition until her aunt had told her to do so. *Id.* Thus, the court concluded that the evidence demonstrated the mother's "utter failure to support her children." *Id.*

As previously discussed, Denise had not had a stable job during her children's lives and admitted that there was no reason why she could not obtain one. She did not testify that her failure to work or help pay for the children's care was because of her attending school full-time or having a disability. She planned to live with Carol for the indefinite future but did not say whether Carol had agreed to care for the children in her absence. And there is some evidence that she declined to take the children to the doctor when offered the opportunity.

Moreover, during the two years before Denise filed her amended counterclaims and sought custody, Derek and Hannah exclusively cared for the children. Although Denise visited the children during this time, there is no evidence that she supported them financially or parented them. Indeed, there is some evidence that she refused to do so in many ways. Although there is no allegation that Denise abandoned the children with Derek and Hannah, the trial court could have reasonably concluded that Denise expected Derek and Hannah to care for the children while she pursued personal interests, including a romantic one. *See id.* (noting that the evidence reflected that the mother "expected others to care for [her children]"). In short, the record does not reflect any evidence that in the two-and-a-half years that this case was pending, Denise

25

demonstrated or attempted to develop any parenting skills that would allow her to support the children. *See* Tex. Fam. Code Ann. § 151.001(a)(2)–(3), (b)–(c) (establishing parent's duties "of care, control, protection, . . . reasonable discipline," and support, including "providing the child with clothing, food, shelter, medical and dental care, and education"). Thus, the trial court aptly noted that Denise needed to "start momming" when it orally pronounced its ruling granting Denise unsupervised visitation.

On the record before us, we conclude that the evidence is sufficient to rebut Section 153.131(a)'s parental presumption and that the trial court did not abuse its discretion by determining that appointing Derek and Hannah as the children's managing conservators was in their best interest. *See Villa*, 299 S.W.3d at 97; *S.T.*, 508 S.W.3d at 491. Thus, we overrule Denise's second issue. Because Denise's second issue incorporates her first issue, we do not expressly address her first issue. *See* Tex. R. App. P. 47.1.

### III. Conclusion

Having overruled Denise's second issue, we affirm the trial court's order.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: February 15, 2024

26